[Cite as *State v. Smith*, 2016-Ohio-3418.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 14 MA 0159 |
| VS. | ) | |
| | ) | OPINION |
| WILLIS SMITH | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of Common Pleas of Mahoning County, Ohio
Case No. 12 CR 1071

JUDGMENT: Affirmed.

APPEARANCES:
For Plaintiff-Appellee

Attorney Paul Gains
Mahoning County Prosecutor
Attorney Ralph Rivera
Assistant Prosecutor
21 West Boardman Street, 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant

Attorney Nikki Baszynski
Assistant Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215

JUDGES:

Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Carol Ann Robb

Dated: June 13, 2016

DeGENARO, J.

{¶1} Defendant-Appellant, Willis Smith, appeals the judgment of the Mahoning County Court of Common Pleas convicting him of one count of gross sexual imposition and sentencing him accordingly. On appeal, Smith argues that the trial court erred in permitting parts of the testimony from the victim's psychiatrist. He also contends his conviction is against the manifest weight of the evidence. For the following reasons, Smith's assignments of error are meritless and the judgment of the trial court is affirmed.

### Facts and Procedural History

{¶2} Smith was indicted by a Mahoning County grand jury on one count of gross sexual imposition, R.C. 2907.05(B) and (C)(2), a third-degree felony. He was accused of sexually molesting his girlfriend's daughter, A.S., who was 11 years old at the time of the offense. Smith pled not guilty and counsel was appointed. The case proceeded to a jury trial where the following evidence was adduced.

{¶3} The victim, A.S., testified that she was 11 years old, and living in a two-bedroom, one-story house in Youngstown, with her mother, Rebecca Sanchez, Smith, and her two younger half-siblings, R.S.[1] and K.S. A.S. said that up until the incident with Smith, she had lived with her mother and Smith for as long as she could remember.

{¶4} A.S. went to bed around 7:30-8:00 p.m. because it was a school night. A.S. and K.S. shared a bedroom, while R.S. slept in his parents' bedroom. A.S. stated that she and her sister would typically watch a movie until they fell asleep as part of their nighttime routine. Her mother went to the store twice, first to buy groceries and the second time to get cigarettes for Smith. According to A.S., when Sanchez left the second time, Smith came into her bedroom, and K.S. was sleeping. Smith got in bed with A.S., under the covers. Smith then put his hand underneath her pants and touched her vagina. A.S. got up and used the bathroom. A.S. stated that she thought Smith would leave her room at that point, but he did not.

{¶5} A.S. went back into her bed and lay down on her stomach, and got

---

[1] Since the brother has the same initials as the victim, he will be referred to as R.S.

under only one of the covers, while Smith was lying underneath all of the covers. Still, Smith continued to touch her, this time on her buttocks, after moving some of the blankets away. A.S. explained that all the touching was underneath her clothes and underwear. A.S. estimated the touching went on for "[a] long time." She said Smith only stopped when Sanchez returned around 9:00 p.m. from getting cigarettes, and began pounding and then kicking on the locked door. A.S. explained that the door was unlocked during her mother's first trip to the store that evening, but that Smith had locked it after she left the second time. Before Smith left her bedroom to let Sanchez in, he told A.S., "don't say anything." A little later that night, Smith told A.S. to lie and say it was she and R.S. who had engaged in inappropriate touching.

{¶6} A.S. did not tell her mother what Smith did that night when her mother got home from the store; she was scared because Smith used to beat them.

{¶7} The next morning, there was a conversation at the kitchen table "about custody of [K.S.] and [R.S.]." Smith said he did not want A.S. in the same house as his two children. Smith then called the police. According to A.S., Smith instructed her and her brother R.S., who then was six years old, to tell police they had engaged in inappropriate behavior; specifically, R.S. was to say that he touched A.S., and she was supposed to verify the story. However, A.S. testified at trial that no inappropriate touching ever occurred between her and her brother. When police arrived, they did not ask her directly what happened.

{¶8} A.S. went to school that morning and after school she went directly to the home of Danny Scott, her biological father, for her weekend visit. A.S. had little contact with her father until age nine, when he began having supervised visitations and eventually regular weekend visitation; subsequently, there was a custody dispute between Scott and Sanchez. Kayla Carr, Scott's fiancée, showed A.S. a copy of the police report that was taken that morning and asked her about the allegations involving her younger brother. A.S. denied touching her brother.

{¶9} Later that evening, A.S. disclosed to Carr that Smith had touched her. Carr and A.S.'s paternal grandmother brought A.S. to the emergency room. Dr. Amy

Petrunak, a pediatric emergency room physician, treated A.S. at around 3:00 a.m. the next morning.

**{¶10}** A.S. told Dr. Petrunak that she been touched by Smith the evening before. Dr. Petrunak testified that she gathered the following information from A.S. about the alleged assault:

> [M]om went shopping with a neighbor once the food stamps had arrived. Patient was left home with Willis Smith, [R.S.], and [K.S.]. At some time after dark * * * the children went to bed. The patient shares her room with [K.S.]. [K.S.] was sleeping, and patient was lying in bed watching TV. Patient was fully clothed wearing a bra, underwear, pajama top, and bottoms, and was covered with blankets. Willis climbed in bed under the covers with the patient and placed his hand inside the patient's underwear and touched his hand over the patient's genitalia and buttocks. Patient denies digital penetration. Willis had on a top and shorts and remained clothed the entire time. Patient was not hurt. Patient denies that she was threatened or hit. Patient was not kissed and did not kiss Willis. There was no exposure involvement of Willis' genitalia. Patient states that this lasted for a while and stopped when the patient's mom got home and was knocking on the door to come in to the house. Patient did not disclose to mom what had happened.

**{¶11}** According to Dr. Petrunak, A.S. denied that she had inappropriately touched her half-brother R.S. Her report, as she read it into the record, continued:

> [T]he patient heard mom and her boyfriend arguing. Willis then called the police to the house and reported that he had discovered the patient inappropriately touching her half-brother [R.S.'s] privates. Last evening at 18:00 the patient was picked up by biological dad's family for weekend visitation. Patient then disclosed that she didn't do anything to

her brother and that Willis had touched her, and her mom instructed her not to tell anyone the truth. Patient was brought to the ER.

**{¶12}** Dr. Petrunak examined A.S. based upon the sexual abuse allegations and observed no abnormalities. However, Dr. Petrunak stated she would not have expected to find any physical evidence of abuse based upon A.S.'s account of what happened. Dr. Petrunak stated there was no need to collect a rape kit from A.S., because there was no allegation of penetration.

**{¶13}** Youngstown Police Officer Michael Marciano responded to the hospital that evening in reference to A.S.'s allegations against Smith. Marciano arrived at 3:03 a.m., and spoke with A.S. briefly. Marciano recalled that it was a "sexual assault type call," and that upon speaking to the victim, A.S., she alleged that the perpetrator was Smith, her mother's boyfriend.

**{¶14}** Sanchez, the victim's mother, testified that she started dating Smith in 2003 and began living with him in 2004 or 2005, when A.S. was two years old. A.S. called Smith "dad," when she was younger. The night of the incident, Smith went grocery shopping, after dinner, when the kids were getting ready for bed. When she returned about one hour later, her two girls were in their bedroom and their son, R.S., was in the other bedroom. The front door was unlocked, as it usually was, because Smith held the only house key.

**{¶15}** Sanchez then left to go to the corner store to buy cigarettes for Smith, upon his request. It was about a five-minute walk away. When she returned at around 9:00 p.m., she found the front door locked. She knocked and got no response. Then she pounded and kicked the door. After a few minutes, Smith finally opened the door. He said he took so long because he was using the bathroom. Sanchez questioned why he felt the need to lock the front door when he never did in the past to go to the bathroom. After that, Sanchez gave him his cigarettes, took a shower, and checked on the kids before going to bed; A.S. appeared to be asleep. Smith did not tell her anything about the kids that night. According to Sanchez, Smith did wake her up to "see if [she] had any more money hiding from him[.]"

{¶16} The next morning, which was a Friday, Smith told Sanchez that he saw A.S. and R.S. acting inappropriately with one another the night before, specifically that he saw R.S. sucking on A.S.'s breast. Smith had not told Sanchez this when she got home from the store the night before. Sanchez said she did not believe him. They started arguing. Smith wanted A.S. out of the house. Smith repeatedly asked A.S. why she did that with her brother and A.S. said she had done nothing and that she did not know what he was talking about. Smith called the police and made a report.

{¶17} Sanchez said she found out on that Monday, through Denise Altomare of Children's Services, that A.S. had disclosed that Smith had actually touched her inappropriately that night. Sanchez left Smith; she moved out of the house that same week "to get away from him because of what he did." She also filed a protection order against Smith on behalf of herself and her children.

{¶18} Sanchez testified that about one month after the incident with Smith, A.S. had to be hospitalized at Belmont Pines Hospital because "she wanted to kill herself." A.S. had never expressed those kind of feelings before the incident.

{¶19} Dr. Joseph Jerome Farris, a child and adolescent psychiatrist at Belmont Pines testified next. He treated A.S. when she was admitted into the acute psychiatric inpatient unit for six days, after she began exhibiting "threats to herself, self-injurious behavior, head banging, hitting herself in the head, and a lot of aggression directed at family members and staff at school."

{¶20} Dr. Farris explained that a team of professionals, including social workers and nurses, work with patients while they are admitted. Throughout his testimony, Dr. Farris referred to A.S.'s chart, which the State did not seek to admit into evidence. Dr. Farris explained that the "vast majority" of the historic information about the patient comes from the nursing assessment done upon admission. "They see all the kids. They gather the historical information, past treatment, social history, family history * * *."

{¶21} Dr. Farris learned through A.S.'s history that she had alleged a prior sexual assault, but admitted that he did not know any details surrounding the

incident. According to the victim's chart, which he read in open court, Dr. Farris had been provided background by the treatment team, that A.S.'s "[b]ehavior has worsened after being sexually abused by mom's boyfriend (has been indicted but not incarcerated)." Dr. Farris diagnosed A.S. "with major depressive disorder and posttraumatic stress disorder."

{¶22} Defense counsel objected multiple times during Dr. Farris' testimony and when the prosecutor finished direct examination, the defense moved to strike all of Dr. Farris' testimony on the grounds that there had "been no solicitation of a medical opinion to a reasonable degree of medical certainty that any of these things that he testified to had to do directly with the crime for which Willis Smith is on trial. * * * If he is not able to tie them to the incident, the testimony should be stricken and the jury should be so instructed."

{¶23} The trial court reviewed Dr. Farris' report and ruled that if Dr. Farris was not able to conclude that the alleged abuse caused the resultant fear and posttraumatic stress disorder that he would sustain the motion to strike the testimony. Accordingly, the trial court permitted the prosecutor to pose that question to Dr. Farris and for the defense to cross-examine.

{¶24} Upon inquiry by the State, Dr. Farris concluded that A.S.'s posttraumatic stress disorder was directly related to the sexual abuse, but was unsure in relation to the depression. He stated that A.S. felt intense fear and helplessness that stemmed from the sexual abuse. On cross-examination, he admitted that he could not know for certain whether any abuse had occurred, since, of course, he was not there when it happened. He also testified that A.S. had undergone counseling prior to being admitted but that his treatment team did not obtain those records. In other words, he did not have a sense of what her baseline mental health issues were before the alleged abuse.

{¶25} Finally, Denise Altomare a caseworker and investigator from Mahoning County Children's Services testified that she investigated the allegations that A.S. made against Smith, along with the allegations Smith made about A.S. and R.S.

Altomare interviewed A.S. at Children's Services four days after the incident. A.S. told Altomare that Smith had "touched her underneath her underwear for several minutes, and that he touched her on her buttocks too." A.S. reported that Smith "touched her underneath her underwear on her private parts." Altomare also asked both A.S. and R.S. about the allegation Smith made, but both denied that this had occurred. Altomare stated that accordingly Smith's allegation was deemed "unsubstantiated."

{¶26} Altomare concluded that sexual abuse by Smith was "indicated" from her investigation; meaning that "there is reason to believe that something happened," but short of a finding of "substantiated." Altomare did not see any signs that A.S. had been coached, and said that A.S.'s statement was consistent with her statement at the emergency room. On cross-examination, she agreed that she investigates alleged sexual abuse of children in such a way to avoid inconsistencies and avoid impairing the credibility of the alleged victim.

{¶27} One exhibit from the State was admitted into evidence, a photograph of the victim at age 11. The defense made a Crim.R. 29 motion for acquittal, which was denied. The defense declined to put on any evidence.

{¶28} After considering all of the evidence, the jury found Smith guilty of one count of gross sexual imposition, as charged, R.C. 2907.05(B) and (C)(2), a third-degree felony. Following a hearing, the trial court sentenced Smith to three years in prison, with 37 days of jail-time credit and five years of mandatory post-release control. Smith was classified as a Tier III sex offender.

### Testimony of Dr. Farris

{¶29} In his first of two assignments of error, Smith asserts:

The trial court erred when it admitted Dr. Farris's testimony. *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989)[.]

{¶30} Smith challenges the trial court's decision to admit the testimony of Dr. Farris, the victim's treating psychiatrist. Evidentiary rulings at trial are typically

reviewed on appeal for an abuse of discretion. *See State v. Beshara*, 7th Dist. No. 07 MA 37, 2009–Ohio–6529, ¶ 55, citing *State v. Bey*, 85 Ohio St.3d 487, 490, 709 N.E.2d 484 (1999). "Abuse of discretion means an error in judgment involving a decision that is unreasonable based upon the record; that the appellate court merely may have reached a different result is not enough." *State v. Dixon,* 7th Dist. No. 10 MA 185, 2013–Ohio–2951, ¶ 21.

**{¶31}** Smith first contends Dr. Farris' testimony was irrelevant; specifically, that Dr. Farris did not properly tie A.S.'s mental health issues to the alleged abuse, since he did not take into consideration her symptoms or treatment prior to her arrival at Belmont Pines. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Evidence which is not relevant is not admissible." Evid.R. 402. Dr. Farris' testimony was relevant to show that the alleged abuse could have caused or exacerbated the victim's mental health issues. This meets the low standard required for relevancy under Evid.R. 401.

**{¶32}** Second, Smith asserts that pursuant to Evid.R. 403 the trial court erred by admitting Dr. Farris' testimony because it was more prejudicial than probative. However, his argument centers on his contention that Dr. Farris was erroneously permitted to opine about whether the victim was telling the truth about the abuse.

**{¶33}** In *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989), modified on other grounds by *State v. Dever*, 64 Ohio St.3d 401, 596 N.E.2d 436 (1992), the Ohio Supreme Court held that "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *Id.* at syllabus. Later, *State v. Stowers*, 81 Ohio St.3d 260, 690 N.E.2d 881 (1998) held that an expert witness's testimony that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children is admissible under the Ohio Rules of Evidence. The court explained that "*Boston's* syllabus excludes expert testimony offering an opinion as to the truth of a child's statements

(e.g., the child does or does not appear to be fantasizing or to have been programmed, or is or is not truthful in accusing a particular person)," but "does not proscribe testimony which is additional support for the truth of the *facts testified* to by the child, or which assists the factfinder in assessing the child's veracity." (Emphasis sic.) *Stowers* at 262–263.

**{¶34}** Further, "if a defendant questions the veracity of the state's witness, the state may present opinion testimony concerning the original witness' reputation for veracity." *State v. Skidmore*, 7th Dist. No. 08 MA 165, 2010-Ohio-2846, ¶ 25, citing *State v. Schechte*r, 44 Ohio St.2d 188, 339 N.E.2d 654 (1975). "'The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but * * * the evidence may refer only to character for truthfulness or untruthfulness* * *.'" *Skidmore* at ¶ 25, quoting Evid.R. 608(A).

**{¶35}** Smith first challenges Dr. Farris' testimony about whether the victim was malingering. However, when the State initially asked Dr. Farris to explain what malingering means and how it is diagnosed on direct examination and then asked a follow-up question regarding malingering, an objection was made by defense counsel, which was sustained.

**{¶36}** But then on cross-examination, the defense asked about malingering:

> DEFENSE: Malingering is actually described in the DSM IV; isn't it?
>
> FARRIS:     Yes.
>
> DEFENSE: By the way, the DSM IV, will you tell the ladies and gentlemen of the jury what that is?
>
> FARRIS:       It stands for Diagnostic Statistics Manual. It's a book of all the disorders, you know, given in mental health. *Malingering would be one where it's given with confidence that no mental health disorder is being given, depression, no posttraumatic, no schizophrenia, no anxiety disorder, but there is intent to deceive for monetary gain * * * Or other reasons.*

DEFENSE: And your assessment that there is no malingering is based upon just talking to her and claiming that what she says makes sense in light of the history?

FARRIS: That and the reports that would have been obtained from Trumbull [ER], the nurse, the behavior at school, and her endorsing symptoms that go along with PTSD.

(Emphasis added.)

**{¶37}** This testimony is not problematic insofar as it was elicited by the defense. Further, Dr. Farris was not testifying about whether the victim was malingering in terms of her abuse allegations, but rather whether she was malingering regarding her psychological issues.

**{¶38}** Smith next takes issue with Dr. Farris' testimony that A.S. was "reliable." However, Smith is taking that statement out of context. Dr. Farris was testifying that A.S. exhibits signs of depression. Then he was asked:

PROSECUTOR: Did you form a reasonable opinion after interviewing [A.S.] based on a reasonable degree of certainty?

FARRIS: Yes. She seemed to be a reliable patient. The information that she reported to me was substantiated by the exam, by the history given by family and by staff at the school gathered by the nurse assessments, yes.

PROSECUTOR: And what was your diagnosis of [A.S.]?

FARRIS: At that time upon presentation we diagnosed her with major depressive disorder and posttraumatic stress disorder * * *.

**{¶39}** Thus, when Dr. Farris stated that A.S. "seemed to be a reliable patient," he was not referring to the sexual abuse allegations. The doctor was saying that the information A.S. self-reported to him regarding her *symptoms* was consistent with the information provided to him by nurses and the family, along with his own

observations of her.

**{¶40}** Smith contends that additional testimony by Dr. Farris improperly characterizes A.S. as unwavering and convincing. The prosecutor noted that "in some part" of Dr. Farris' report, he had used the word "convincing," and asked the doctor to explain what he meant by the use of that word. Dr. Farris responded:

> If that would have been in the memo, so convincingly is a way that, you know, said without doubt. So in terms of where it's most often noted, you know, in thoughts to hurt herself, hurt others, that her intent to convey a clear message to me is, you know, what's expressed. And you know, no kidding aside, all seriousness that this is, you know, how I feel, no wavering.

**{¶41}** However, this testimony relates to A.S.'s mental health issues, not the alleged abuse. Although an expert may not offer an opinion as to the truth of a child's allegations, an expert may give an opinion "which is additional support for the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity." *Stowers* at 262-263; *State v. Rosado*, 7th Dist. No. 02 CA 10, 2003-Ohio-2927, ¶ 19. Dr. Farris' testimony, as outlined above, falls within the latter category and was therefore proper.

**{¶42}** Smith also challenges the fact that when Dr. Farris was asked by the State whether it was his opinion that the diagnosis of PTSD and depression stemmed "directly from *that* sexual abuse she experienced," he said it did. Smith argues it was improper for the doctor to give his opinion as to whether the victim's psychological problems stemmed from one specific incident of sexual abuse.

**{¶43}** The phrasing of the question posed by the prosecutor which was language sanctioned earlier in the proceedings by the trial court, is somewhat problematic. The question that should have been posed was whether the victim's PTSD and depression were consistent with what is typically seen in sexually abused children. *See Stowers*. However, Dr. Farris went on to clearly testify that there was

simply no way for him to know whether the abuse had occurred; he was not there to witness it. Additionally, Dr. Farris said he did not ask A.S. about details regarding the alleged abuse; he stated that he only had the history provided from the nursing assessment. Most importantly, Dr. Farris never gave a direct opinion regarding whether A.S. was being truthful about her allegations against Smith.

**{¶44}** The State asserts that assuming arguendo the trial court erred in admitting some parts of Dr. Farris' testimony, any error was harmless since the victim testified at trial and was subject to cross-examination.

**{¶45}** "[R]ecent case law states that *'Boston* does not apply when the child victim actually testifies and is subject to cross-examination.'" *State v. Hupp*, 3d Dist. No. 1-08-21, 2009-Ohio-1912, ¶ 20, quoting *State v. Thompson*, 5th Dist. No. 06CA28, 2007-Ohio-5419, ¶ 50, quoting *State v. Benjamin*, 8th Dist. No. 87364, 2006-Ohio-5330, ¶ 19 citing *State v. Fuson*, 5th Dist. No. 97 CA 000023 (Aug. 11, 1998). The Third District reasoned that "[w]hen the victim testifies, the jury is able to hear the victim's answers, witness her demeanor and judge her credibility completely independent of the other's testimony concerning the veracity of the victim." *Hupp* at ¶ 20, citing *State v. Amankwah*, 8th Dist. No. 89937, 2008-Ohio-2191, ¶ 44. Accordingly, where the victim testifies, other witness testimony concerning the victim's veracity can be harmless error. *Thompson* at ¶ 51. Here, even if portions of Dr. Farris' testimony were problematic in some way, it was harmless error.

**{¶46}** In sum, the trial court did not abuse its discretion in permitting Dr. Farris to testify. Accordingly, Smith's first assignment of error is meritless.

### Manifest Weight

**{¶47}** In his second and final assignment of error Smith asserts:

The verdict was against the manifest weight of the evidence. Ohio Constitution, Article IV, Section 3(B)(3)[.].

**{¶48}** "Weight of the evidence concerns the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the

other." (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A conviction will only be reversed as against the manifest weight of the evidence in exceptional circumstances. *Id*. This is so because the triers of fact are in a better position to determine credibility issues, since they personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

**{¶49}** Thus, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. However, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99 CA 149, 2002–Ohio–1152, *2, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). Under these circumstances, the verdict is not against the manifest weight and is affirmed.

**{¶50}** Smith was convicted of one count of gross sexual imposition. "No person shall knowingly touch the genitalia of another, when the touching is not through clothing, the other person is less than twelve years of age, whether or not the offender knows the age of that person, and the touching is done with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." R.C. 2907.05(B).

**{¶51}** Smith mainly argues that his conviction is against the manifest weight of the evidence because of inconsistencies in the victim's testimony. He points out the following: According to her Dr. Petrunak's report, A.S. reported to her that the abuse occurred when her mother went grocery shopping with a neighbor. But, A.S. testified at trial that the abuse occurred when her mother left a second time to get cigarettes. Additionally, A.S. told Altomare that she told Smith to stop in the middle of the

incident and then got up to go to the bathroom. But, she did not report that bathroom trip to Dr. Petrunak and she testified at trial that. "I didn't ask him. I just got up." Further, A.S. testified that she was first on her back during the abuse, but reported initially to Altomare that she was first on her stomach.

{¶52} Smith additionally notes that when A.S. was at the emergency room, she reported to Dr. Petrunak that she had told her mother about the incident the next morning and that her mother told her not to "tell anyone the truth." But, A.S. testified at trial that she did not tell her mother what happened and her mother testified that Altomare was the person who told her about the abuse allegations. Smith also takes issue with some inconsistencies regarding when precisely Smith first told A.S. and her brother to lie and say that they had been inappropriately touching each other.

{¶53} Finally, Smith argues that the victim's account of the duration of the incident cannot be squared with the five to eight minutes it took for her mother to go to the corner store and back for cigarettes that night. However, with regard to this point, A.S. later testified that she was not watching a clock during the incident and that she was merely estimating the time it took for Smith to enter her bed, touch her, and for her to get up to go to the bathroom and then return to bed.

{¶54} Moreover, as the State points out, A.S. was consistent with regard to her core allegations, namely that Smith got into her bed and touched her vagina and buttocks, underneath her clothing. It was up to the jury to take in account any inconsistencies in her testimony when judging her credibility. Simply put, the inconsistencies cited by Smith do not render A.S. completely incredible.

{¶55} The jury had to weigh the competing theories of the case. The State alleged that A.S. was sexually abused by Smith, and that she failed to immediately tell her mother and police what happened because she was scared. On the other hand, the defense alleged that A.S. was lying about the abuse to cover up the fact that Smith had caught her acting in a sexually inappropriate manner with her younger brother. Neither version appears completely incredible or unbelievable. In light of that, it was within the province of the trier of fact, the jury, to make the ultimate

credibility determinations, especially since the jury saw the witnesses testify and all we have is a "cold" record. *See Hill*; *DeHass*; *Dyke, supra*. The jury did not lose its way in convicting Smith of gross sexual imposition. Accordingly, Smith's second and final assignment of error is meritless.

{¶56} Thus, for all of the above reasons, both of Smith's assignments of error are meritless, and the judgment of the trial court is affirmed.

Waite, J., concurs.

Robb, J., concurs.