[Cite as *In re T.W.*, 2024-Ohio-4697.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In The Matter of:                          :
                                                          No.  23AP-143
[T.W.,                                         :        (C.P.C. No. 22JU-861)

                                                   :          (REGULAR CALENDAR)
                     Appellant].
                                                   :

---

D E C I S I O N

Rendered on September 26, 2024

---

**On brief**: *G. Gary Tyack*, Prosecuting Attorney, and *Michael A. Walsh*, for appellee.

**On brief**: *Mitchell A. Williams*, Public Defender, and *Robert D. Essex*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

EDELSTEIN, J.

{¶ 1}  Appellant, T.W., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, adjudicating him a delinquent minor for committing the offense of rape. For the reasons that follow, we affirm.

## I.  Facts & Procedural History

{¶ 2}  On January 27, 2022, plaintiff-appellee, the State of Ohio, filed a complaint alleging that T.W. was delinquent for committing one count of rape in violation of R.C. 2907.02(A)(2). The complaint alleged that, on November 12, 2021, T.W. engaged in vaginal intercourse with N.C. by purposely compelling her to submit by force. T.W. denied the charge and the court referred the case to a magistrate pursuant to Juv.R. 40.

{¶ 3}  On April 28, 2022, a 5-day trial before the magistrate commenced. The evidence presented at trial demonstrated that, on November 12, 2021, 13-year-old N.C. and

17-year-old T.W. arranged to meet at the Tuttle Mall in Columbus, Ohio. N.C. explained that she had known T.W. for about 1 year and that they were "sort of" dating when they went to the mall that day. (Apr. 28, 2022 Tr. at 46.) N.C. arrived at the mall with her friend, C.H., and T.W. arrived at the mall with his friend, K.J.L. K.J.L. described the group's meeting at the mall as a "two set," or a type of double date. (May 6, 2022 Tr. at 64.)

{¶ 4} The four minors walked around the mall together, purchased food, and looked at clothes. N.C. noted that she and T.W. were "flirting with each other and hugging and kissing and things like that" while walking around the mall. (Apr. 28, 2022 Tr. at 46.) C.H. purchased two shirts at the store Forever 21 but could not try the shirts on because the fitting rooms at Forever 21 were closed. As such, the group walked to the fitting rooms at JCPenney.

{¶ 5} N.C. and C.H. entered adjacent fitting rooms at JCPenney and C.H. threw a shirt over the fitting room wall for N.C. N.C. stated that, when she bent down to pick the shirt up, T.W. entered her fitting room and locked the door behind him. N.C. stated that T.W. then pulled her pants down and when she "bent down to grab [her] pants back he took his arm, * * * and bent [her] back over" like he was "press[ing] down on [her] back for [her] to stay bent over." (Apr. 28, 2022 Tr. at 49-50.) N.C. stated that T.W. then pulled down his pants and inserted his penis into her vagina. N.C. told T.W. "no" and "stop" and T.W. told her to "shut up." (Apr. 28, 2022 Tr. at 52.) N.C. stated that T.W. ejaculated on the floor, she pulled her pants up, and he walked out of the fitting room. After the incident, N.C. was "crying and [C.H.] was hugging [her]," and N.C. "whispered in [C.H.'s] ear like he just raped me, he just raped me." (Apr. 28, 2022 Tr. at 54.)

{¶ 6} The four minors then walked out of the mall because N.C.'s parents were on their way to pick up N.C. and C.H. N.C. stated that T.W. "tr[ied] to hug [her] and kiss [her]" as they were walking out, but she was being "distant" and "holding on to [C.H.]." (Apr. 28, 2022 Tr. at 55.) C.H. stated that T.W. seemed "angry and mad" as they were walking out of the mall and told her "not to touch [N.C.]." (May 2, 2022 Tr. at 35.) The girls left the mall when N.C.'s parents arrived.

{¶ 7} During the evening of November 12, 2021, N.C. received a message on Instagram from a person claiming to be T.W.'s "baby mother." (Nov. 22, 2022 Tr. at 81.) N.C. replied to the Instagram message, and then texted T.W. and told him they were done.

N.C. blocked T.W.'s phone number and Instagram account. At 3:00 a.m. the following morning, N.C. told her mother that T.W. had raped her at the mall.

{¶ 8} N.C.'s mother scheduled a medical appointment with N.C.'s primary care physician. N.C.'s mother informed the doctor that N.C. needed pregnancy and STD tests because of the incident at the mall. N.C. stated that she did not want to report the incident to police, but her doctor's office reported "it to the police because they had no choice." (May 2, 2022 Tr. at 11.)

{¶ 9} On December 16, 2021, Laura Romans, a forensic interviewer at the Nationwide Children's Hospital child advocacy center ("CAC"), interviewed N.C. regarding the incident with T.W. N.C. also spoke with Detective Jeffrey Huhn of the Columbus Police Department after the CAC interview. Following his investigation, Detective Huhn obtained a warrant for T.W.'s arrest.

{¶ 10} On February 20, 2022, Officer Samuel Moore executed the warrant for T.W.'s arrest. Officer Moore's body-worn camera documented his interaction with T.W. and the state played the body-worn camera video footage at trial. The footage documented T.W. stating he knew "what the rape charge [was] for. It's cause this little 13-year-old lied about her age and she told [him] that she was 16 or 17." (Apr. 28, 2022 Tr. at 24.) T.W. told Officer Moore that he "end[ed] up going to the mall" with the 13-year-old and "end[ed] up fucking her in the fitting room." (Apr. 28, 2022 Tr. at 24.) T.W. also stated he knew he "didn't rape that little girl," noting the girl was "[t]alking about she wanted to be [his] baby mom the whole trip." (Apr. 28, 2022 Tr. at 29-30.)

{¶ 11} T.W. made a Crim.R. 29 motion for dismissal at the conclusion of the state's evidence and again at the conclusion of all the evidence. The magistrate denied both motions. At the conclusion of the trial, the magistrate determined the state had established T.W.'s guilt beyond a reasonable doubt. On May 31, 2022, the magistrate issued a decision adjudicating T.W. delinquent for having committed the offense of rape. T.W. filed objections to the magistrate's delinquency adjudication, alleging the adjudication was against the manifest weight of the evidence and the state impermissibly bolstered N.C.'s testimony.

{¶ 12} On September 12, 2022, the magistrate held a dispositional hearing. The magistrate ordered T.W. to complete programming at a residential treatment facility, to

comply with all requirements of his Juvenile Community Enrichment Services, and to register as a Tier II sex offender. On October 2, 2022, the magistrate issued a judgment entry reflecting the disposition announced at the September 12, 2022 hearing. T.W. filed objections to the magistrate's disposition, asserting the magistrate erred by placing him at the residential treatment facility and by ordering him to register as a Tier II sex offender.

{¶ 13} On October 12, 2022, T.W. filed a motion requesting that the court hear additional evidence in the case. The trial court granted T.W.'s motion and held a hearing for that purpose on November 22, 2022.

{¶ 14} On February 1, 2023, the trial court issued a decision and judgment entry overruling T.W.'s objections to the magistrate's adjudication and overruling in part and granting in part T.W.'s objections to the magistrate's disposition. The court overruled T.W.'s objection asserting the magistrate's adjudication was against the manifest weight of the evidence. The court noted that, while there were discrepancies concerning the "tangential actions of N.C. and the group of minors at the Tuttle Mall," none of the "discrepancies concern[ed] the elements around the act of rape itself." (Decision at 6.) The trial court sustained T.W.'s objection to the magistrate's dispositional order requiring him to register as a Tier II sex offender. The court overruled T.W.'s remaining objections.

## II. Assignments of Error

{¶ 15} T.W. appeals, assigning the following errors for our review:

> [I.] The trial court erred when it entered judgment against the appellant which such judgment was against the manifest weight of the evidence in violation of his right to due process of law.

> [II.] The trial court erred when it entered judgment against the appellant when the evidence was insufficient to sustain an adjudication in violation of his right to due process of law.

## III. Analysis

{¶ 16} In his first assignment of error, T.W. asserts that his delinquency adjudication was against the manifest weight of the evidence. T.W.'s second assignment of error asserts that his delinquency adjudication was based on insufficient evidence. Our review of the sufficiency of the evidence and the manifest weight of the evidence in a juvenile delinquency adjudication is the same as for adult criminal defendants. *In re C.S.*,

10th Dist. No. 11AP-667, 2012-Ohio-2988, ¶ 23, citing *In re D.R.*, 10th Dist. No. 05AP-492, 2006-Ohio-5205. The legal concepts of sufficiency and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 17} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a verdict. *Id.* at 386. Whether the evidence is legally sufficient to support a verdict is a question of law. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A verdict will not be disturbed on sufficiency of the evidence unless, after viewing the evidence in the light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 18} "[T]he criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. Thus, although there may be sufficient evidence to support a judgment, a court may nevertheless conclude that a judgment is against the manifest weight of the evidence. *Thompkins* at 387. When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 19} In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-

Ohio-4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, we afford great deference to the trier of fact's determination of witness credibility. *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55. *See State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus (credibility determinations are primarily for the trier of fact). The fact finder is free to believe "all, part, or none of the testimony of each witness appearing before it." *Cattledge* at ¶ 6, citing *Hill v. Briggs*, 111 Ohio App.3d 405, 412 (10th Dist.1996). "If evidence is susceptible to more than one construction, reviewing courts must give it the interpretation that is consistent with the verdict and judgment." *Id.*, citing *White v. Euclid Square Mall*, 107 Ohio App.3d 536, 539 (8th Dist.1995).

{¶ 20} The trial court found T.W. delinquent for committing the offense of rape in violation of R.C. 2907.02(A)(2). R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Sexual conduct includes vaginal intercourse between a male and female. R.C. 2907.01(A). To prove the force element of a sexual offense, the state must establish force beyond that force inherent in the crime itself. *State v. Griffith*, 10th Dist. No. 05AP-1042, 2006-Ohio-6983, ¶ 17, citing *State v. Dye*, 82 Ohio St.3d 323 (1998). *See State v. Eskridge*, 38 Ohio St.3d 56 (1988), paragraph one of the syllabus (stating that the "force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other"). A person acts with purpose "when it is the person's specific intention to cause a certain result." R.C. 2901.22(A).

{¶ 21} N.C. testified that T.W. entered her fitting room at JCPenney without her permission, pulled her pants down, and used his hand to press down on her back to bend her over. N.C. stated that she "told [T.W.] to move," but that he was using "force" and "like applied more pressure with his hand to bend [her] over." (Apr. 28, 2022 Tr. at 51.) N.C. stated that after T.W. bent her over, he placed his penis inside her vagina. According to her

trial testimony, N.C. told T.W. "no, no, no," but he told her to shut up and placed his hand over her mouth so that her voice was "mumbled." (Apr. 28, 2022 Tr. at 51-53.) N.C. stated that she did not consent to having sex with T.W. Therefore, N.C.'s testimony established the elements of the offense of rape. *See State v. D.E.M.*, 10th Dist. No. 15AP-589, 2016-Ohio-5638, ¶ 111, quoting *State v. Fortson*, 8th Dist. No. 92337, 2010-Ohio-2337, ¶ 47 (stating that "[u]nder Ohio law, 'a rape victim's testimony alone, if believed, is enough evidence for a conviction' ").

{¶ 22} T.W. acknowledges that, because he admitted to having sex with N.C., the sole issue in the case "was whether [he] compelled N.C. to submit by force." (Appellant's Brief at 18.)  T.W. asserts that "substantial inconsistencies in N.C.'s story" rendered her testimony unworthy of belief.  (Appellant's Brief at 18-19.)  However, "an accused is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented." *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 29.  "The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." *Id.*, citing *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58.  *Accord State v. Mann*, 10th Dist. No. 10AP-1131, 2011-Ohio-5286, ¶ 37, quoting *State v. Nivens*, 10th Dist. No. 95APA09-1236, 1996 Ohio App. LEXIS 2245 (May 28, 1996) (noting that the " 'jury may take note of the inconsistencies and resolve or discount them accordingly' "); *State v. Favor*, 10th Dist. No. 08AP-215, 2008-Ohio-5371, ¶ 10.  We will address each of the inconsistencies T.W. identifies in his brief.

{¶ 23} T.W. initially notes that, while N.C. testified at trial she met T.W. in person for the first time at the mall on November 12, 2021, N.C. told Ms. Romans and Detective Huhn that she previously met T.W. at the mall in October 2021.  After defense counsel played the recordings of N.C.'s prior statements at trial, N.C. stated that she did remember meeting T.W. at the mall in October 2021. N.C. stated she was "very confused because [she] did not know the exact date" of their prior meeting. (Apr. 28, 2022 Tr. at 70.)  Thus, when confronted with her prior statements, N.C. admitted that she had previously met T.W. at the mall.  *Compare In re Z.B.*, 9th Dist. No. 09CA0039-M, 2010-Ohio-1345, ¶ 20 (finding the defendant's rape conviction against the manifest weight of the evidence, in part, because the victim testified at trial that she "hardly knew Z.B. on the date of the incident," but

previously told a police officer that Z.B. was "a long time friend," and when confronted with her prior statement at trial, the victim "denied that she made that statement").

{¶ 24} T.W. further notes that, while N.C. testified at trial she was in a relationship with T.W. on November 12, 2021, and was hugging and kissing him that day, N.C. told Ms. Romans during the CAC interview that T.W. was not her boyfriend and she rejected his attempts to kiss her at the mall. Defense counsel played clips from the CAC interview during N.C.'s cross-examination, which documented N.C. telling Ms. Romans when T.W. tried to kiss her she told him "[b]ack up. And you're just my friend and I have a boyfriend and you're trippin'," and, "I do not wanna (sic) kiss you. I don't like you like that. I told you you were my friend and I told you I had a boyfriend." (May 2, 2022 Tr. at 21, 25.) When confronted with her prior statements to Ms. Romans, N.C. confirmed she made these statements to T.W., but stated she made them "[a]s a joke." (May 2, 2022 Tr. at 21-22, 26.)

{¶ 25} T.W. notes that, at trial, N.C. denied having a boyfriend other than T.W. in November 2021. Defense counsel impeached N.C.'s testimony with statements she made to Ms. Romans during the CAC interview indicating she had a boyfriend named Miami who lived in Miami, Florida, they had been in a relationship for two years, and they met on an app called Monkey. When confronted with her prior statements at trial, N.C. denied having another boyfriend when she went to the mall with T.W. on November 12, 2021. N.C. also confusingly stated she did have a boyfriend "at that time, but while [she] was dating [T.W. she] didn't have him." (Apr. 28, 2022 Tr. at 71.) Notably, K.J.L. described N.C. as T.W.'s "bop," meaning that she was his girlfriend when she was around him but was not his girlfriend when she was not around him. (May 6, 2022 Tr. 83-84.)

{¶ 26} T.W. next addresses a portion of N.C.'s trial testimony when she stated that, while C.H. was inside Forever 21, N.C. and T.W. stood together in front of the store and T.W. "kept on trying to touch [her] private part and [she] kept on dropping down to the floor" and using his "belt to help [her] back up." (Apr. 28, 2022 Tr. at 82.) N.C. testified that each time T.W. tried to touch her private part she "would continue to drop back down." (Apr. 28, 2022 Tr. at 82.) T.W. asserts this "assault allegation [was] simply not worthy of belief," because N.C. initially told Ms. Romans during the CAC interview that she and C.H. went into Forever 21 together and subsequently told Ms. Romans that all four minors went into Forever 21 together. (Appellant's Brief at 21; Apr. 28, 2022 Tr. at 86-87; State's Ex. 3,

CAC interview, at 31:00, 54:25.) However, N.C. also told Ms. Romans that, while C.H. was inside Forever 21, she and T.W. remained outside the store and T.W. attempted to touch her private part. And, during the interview, N.C. demonstrated for Ms. Romans how T.W. briefly touched her breast and genital area on the outside of her clothes. (State's Ex. 3, CAC Interview at 56:00-57:00.) Accordingly, regardless of who went into Forever 21 and when, N.C. consistently stated that T.W. attempted to touch her private part while they were standing outside Forever 21.

{¶ 27} T.W. notes that while N.C. also told Ms. Romans he tried to grab her private part when they were on the elevator at the mall, "N.C. did not testify in court as to any assault occurring on the elevator." (Appellant's Brief at 22; State's Ex. 3, CAC Interview at 31:50.) However, defense counsel only asked N.C. if the four minors rode on an elevator at the mall, and N.C. responded stating, "I don't remember. We might've, yes." (Apr. 28, 2022 Tr. at 83.) Defense counsel never specifically asked N.C. if T.W. tried to touch her private part while riding on the elevator. (Apr. 28, 2022 Tr. at 83-85.)

{¶ 28} T.W. further notes that N.C., C.H., and K.J.L. all testified to different versions of what occurred in the JCPenney fitting rooms. N.C. testified that during the sexual assault in the fitting room she "hear[d] someone playing with the door and saying let me in, let me in." (Apr. 28, 2022 Tr. at 52.) N.C. "assum[ed] that was [C.H.]" and stated she was "100% sure" it was C.H. "because [she] could hear her voice saying let me in, let me in." (Apr. 28, 2022 Tr. at 52.) During her interview with Detective Huhn, N.C. also stated that C.H. was "banging on" the fitting room door and saying "let me in, let me in" during the incident. (Apr. 28, 2022 Tr. at 97.)

{¶ 29} At trial, C.H. denied ever standing outside the fitting room door and saying "let me in." (May 2, 2022 Tr. at 42.) C.H. confirmed that she and N.C. went into adjacent fitting rooms at JCPenney and that she threw a shirt over the fitting room wall for N.C. However, C.H. stated that she then tried on her shirt, came out of the fitting room, showed the shirt to N.C., went back into her fitting room, changed her shirt, and then exited the fitting room area. C.H. stated that T.W. and K.J.L. were standing in the fitting room hallway when she left the fitting room area. C.H. looked at shirts in JCPenney for approximately two minutes, then came back to the fitting room area and "that was when [she] saw [T.W.] exiting [N.C.'s] room." (May 2, 2022 Tr. at 30.) C.H. stated that after T.W. exited N.C.'s

fitting room, she knocked on the fitting room door "and tried to open it and [N.C.] said, 'Hold on,' and she sounded upset. And then when she came out, she was crying, and that's when she told [C.H.] what happened." (May 2, 2022 Tr. at 31.) N.C. told C.H. " 'He raped me.' " (May 2, 2022 Tr. at 32.)

{¶ 30} K.J.L. testified that T.W. and N.C. went inside a fitting room together while he and C.H. stood in the fitting room hallway. K.J.L. stated that after about five to eight minutes, T.W. and N.C. came out of the fitting room together. K.J.L. stated neither he nor C.H. left the fitting room area during this time. K.J.L. also stated that, while they were in the hallway, he was climbing on door hinges and "[s]winging back and forth" on the fitting room doors "like a monkey." (May 6, 2022 Tr. 84-85.) K.J.L. confirmed his climbing and swinging on the fitting room doors made a "loud * * * noise." (May 6, 2022 Tr. 85.) K.J.L. also testified that T.W. and N.C. left the fitting room together, "still hugging and holding hands." (May 6, 2022 Tr. at 70.)

{¶ 31} T.W. asserts that N.C.'s version of events was meaningfully different from C.H.'s version, because N.C. testified that C.H. attempted to enter the fitting room during the incident and said "let me in," while C.H. testified that she was not present in the fitting room area during the incident and she never said "let me in." The trial court noted that it "[did] not expect young minors to accurately identify[] voices, [and] positions of people outside a dressing room" during a sexual assault, especially since K.J.L. was "climbing on doors hinges, making noise, and jostling doors" during the incident. (Decision at 6.) Moreover, C.H. testified that, after T.W. exited the fitting room, she tried "to get into [N.C.'s] fitting room and knock[ed] on the door" and "wiggle[d] the handle to open the door." (May 2, 2022 Tr. at 50.) Thus, C.H. testified to knocking on the fitting room door and wiggling the door handle, albeit after, rather than during, the incident.

{¶ 32} T.W. further notes that N.C. testified T.W. wrapped his hand around her mouth during the incident, but she told Detective Huhn T.W. "tried to choke [her]" during the rape "[b]ut he couldn't because he couldn't like bend down enough." (Apr. 28, 2022 Tr. at 97.) T.W. asserts that N.C.'s trial testimony lacked credibility because, if T.W. was "unable to reach her neck, then he would also be unable to reach her mouth." (Appellant's Brief at 25.)

{¶ 33} T.W. also notes that N.C. stated, both at trial and during the CAC interview, that C.H. punched T.W. in the neck when he opened the fitting room door and T.W. responded stating, "bro, why would you do that I just got a tattoo right there." (Apr. 28, 2022 Tr. at 103; State's Ex. 3, CAC Interview at 34:45.) However, C.H. testified that she never punched T.W. in the neck, and K.J.L. testified that he did not see C.H. punch T.W. in the neck.

{¶ 34} T.W. finally asserts that N.C.'s testimony lacked credibility because she told differing versions of how T.W. expressed to her that he was raped as a child. On direct examination, N.C. testified that, following the incident in the fitting room, T.W. went "back into the fitting room and typed * * * a sentence in his notes [app] of his phone" stating he "had herpes 'cause he was raped when he was a kid." (Apr. 28, 2022 Tr. at 53-54.) On cross-examination, defense counsel played portions of the CAC interview when N.C. told Ms. Romans that T.W. verbally told her while they were standing outside the mall that he was raped as a child. Defense counsel also played a portion of N.C.'s interview with Detective Huhn when she stated that after T.W. "ejaculated on the floor and then [she] was like * * * bro, why would you do that and he's like oh, I got raped when I was a kid." (Apr. 28, 2022 Tr. at 94.) N.C. *did* present inconsistent versions of how and where T.W. told her he was raped as a child. We nonetheless note that she consistently described T.W. justifying his conduct as a consequence of being raped as a child.

{¶ 35} N.C.'s testimony contained several inconsistencies for the trier of fact to resolve. Her trial testimony differed from her prior statements regarding whether she had previously met T.W. in person, whether she willingly kissed him at the mall, whether she had another boyfriend at the time of their meeting, and whether T.W. was able to place his hand over her mouth during the sexual encounter. N.C.'s testimony differed from C.H.'s testimony regarding where C.H. was during the sexual assault and when she attempted to enter N.C.'s fitting room. N.C.'s testimony differed from both C.H.'s testimony and K.J.L.'s testimony regarding whether C.H. hit T.W. in the neck following the incident. And, N.C. told several different versions of how T.W. shared with her that he was raped as a child.

{¶ 36} Notably, however, Ms. Romans testified that it was "common" for juveniles disclosing abuse to "jumble" facts. (May 6, 2022 Tr. 31-32.) *Compare State v. J.E.C.,* 10th Dist. No. 12AP-584, 2013-Ohio-1909, ¶ 43 (finding the defendant's convictions were not

against the manifest weight of the evidence even though "the jury heard evidence of [the victim's] equivocation about the sex abuse," because the state presented evidence demonstrating that "children sometimes equivocate on their disclosure" of sexual abuse). N.C. was 13 years old at the time of the incident and 14 years old when she testified at trial. Detective Huhn agreed there were differences between N.C.'s and C.H.'s version of events but stated he did not feel the differences "were significant" and that the differences concerned "things that most teenagers wouldn't pay a lot of attention to." (May 3, 2022 Tr. 47.) The trier of fact could have agreed with Detective Huhn's assessment after considering all of the evidence.

{¶ 37} Furthermore, while there were inconsistencies in N.C.'s testimony, there were also notable consistencies in the evidence.  N.C. testified that immediately after the incident she was "crying" and told C.H. that T.W. had "just raped [me]." (Apr. 28, 2022 Tr. at 54.) C.H. similarly testified that when N.C. opened the fitting room door she "was crying" and told C.H., " 'He raped me.' " (May 2, 2022 Tr. at 31-32.) Although C.H. was N.C.'s friend at the time of the incident, C.H. stated at trial that they were "no longer friends" and she was only testifying because she was subpoenaed.  (May 2, 2022 Tr. at 36.)  Additionally, from N.C.'s initial immediate disclosure to C.H., to her statements to Ms. Romans and Detective Huhn, to her testimony at trial, N.C. never equivocated in her accusation that T.W. engaged in non-consensual, forced sexual intercourse with her in the fitting room. N.C. explained at trial that, while she did not remember certain aspects of their day at the mall, her memory of what occurred in the JCPenney fitting room with T.W. was "[v]ery clear." (May 2, 2022 Tr. at 15.)

{¶ 38} As such, we do not find any of the noted inconsistencies in N.C.'s various statements rendered her testimony regarding the sexual assault unbelievable. *See State v. Smith*, 7th Dist. No. 14 MA 0159, 2016-Ohio-3418, ¶ 54 (noting that "A.S. was consistent with regard to her core allegations" and the "inconsistencies [in her testimony] cited by Smith [did] not render A.S. completely incredible"). *Compare State v. Short*, 10th Dist. No. 22AP-543, 2024-Ohio-92, ¶ 94, quoting *State v. Weber*, 124 Ohio App.3d 451, 466 (10th Dist.1997) (finding a verdict to be against the manifest weight of the evidence because the " 'evidence presented by the state in th[e] case [was] marked by uncertainties and a lack of sufficient probative evidence on crucial factual issues' ").  Furthermore, while T.W. alleges

that N.C. could have fabricated the rape allegation to hide a consensual sexual encounter from her parents or boyfriend, the trier of fact heard N.C.'s testimony indicating that she may have had another boyfriend at the time and that she initially asked her mother "not to tell" her father about the sexual assault. (Apr. 28, 2022 Tr. at 118.) Accordingly, it was within the province of the trier of fact to determine whether N.C. fabricated the rape allegation for either reason.

{¶ 39} As noted, the trier of fact was in the best position to observe N.C.'s manner and demeanor as she testified and to determine whether her testimony was credible. *Rankin*, 2011-Ohio-5131 at ¶ 29. " '[W]here a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding * * * as being against the manifest weight of the evidence.' " *In re L.J.*, 10th Dist. No. 11AP-495, 2012-Ohio-1414, ¶ 21, quoting *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26. Reviewing the entire record and affording appropriate deference to the trier of fact's determination of credibility, we do not find the trier of fact clearly lost its way and created a manifest miscarriage of justice by finding N.C.'s testimony regarding the rape credible. Therefore, T.W.'s delinquency adjudication for rape was not against the manifest weight of the evidence. Based on the foregoing, we overrule T.W.'s first assignment of error.

{¶ 40} T.W.'s second assignment of error asserts his delinquency adjudication was not supported by sufficient evidence. However, pursuant to our above analysis, we have already found the adjudication supported by the manifest weight of the evidence. "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 11, citing *State v. Braxton*, 10th Dist. No. 04AP-725, 2005-Ohio-2198, ¶ 15. *Accord Columbus v. Gunthorp*, 10th Dist. No. 21AP-313, 2022-Ohio-138, ¶ 18. *See Thompkins*, 78 Ohio St.3d at 388, citing *Tibbs v. Florida*, 457 U.S. 31, 41 (1982). Thus, our conclusion that T.W.'s delinquency adjudication is supported by the weight of the evidence demonstrates the adjudication is supported by sufficient evidence as well. As such, we overrule T.W.'s second assignment of error.

## IV. Conclusion

{¶ 41}  Having overruled T.W.'s first and second assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

LUPER SCHUSTER and JAMISON, JJ., concur.

_____