[Cite as *State v. Perry*, 2025-Ohio-2054.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 23AP-714 |
| | | (C.P.C. No. 22CR-0853) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Joshua Perry, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 10, 2025

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Benjamin A. Tracy*, for appellee. **Argued:** *Benjamin J. Tracy*.

**On brief:** *Brian J. Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Defendant-appellant, Joshua Perry, appeals from the November 3, 2023 judgment of the Franklin County Court of Common Pleas finding him guilty of felonious assault, abduction, and domestic violence. For the following reasons, we affirm.

## I. PROCEDURAL BACKGROUND

{¶ 2} On March 4, 2022, a Franklin County Grand Jury returned a five-count indictment charging Mr. Perry with kidnapping, felonious assault, abduction, domestic violence, and having a weapon while under disability. All offenses involved the mother of Mr. Perry's child, D.C., and were alleged to have occurred at D.C.'s home on February 24, 2022.

{¶ 3}   Trial commenced on August 7, 2023.  Following the presentation of evidence, the jury returned a verdict finding Mr. Perry guilty of felonious assault (Count 2), abduction (Count 3), and domestic violence (Count 4).  The jury found Mr. Perry not guilty of kidnapping (Count 1) and having a weapon while under a disability (Count 5).

{¶ 4}   At the November 1, 2023 sentencing hearing, the trial court imposed an aggregate indefinite prison sentence of 10 to 13.5 years.  Mr. Perry's convictions and sentence were memorialized in the trial court's November 3, 2023 judgment entry.

{¶ 5}   Mr. Perry now appeals from that judgment and raises the following four assignments of error for our review:

> [I.]  THE TRIAL COURT ERRED WHEN IT DENIED [MR. PERRY'S] [CRIM.] RULE 29 MOTION FOR ACQUITTAL.
>
> [II.] THE TRIAL COURT ERRED WHEN IT ADMITTED THE TESTIMONY OF A WITNESS UNDER EVIDENCE RULE 702.
>
> [III.] THE TRIAL COURT ERRED WHEN IT ALLOWED THE ADMISSION OF A STATEMENT UNDER EVIDENCE RULE 804 (B)(6).
>
> [IV.] THE VERDICTS OF GUILT AS TO THE COUNTS OF FELONIOUS ASSAULT, ABDUCTION, AND DOMESTIC VIOLENCE [ARE] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## II.  FACTUAL OVERVIEW

{¶ 6}   The following facts were established at Mr. Perry's August 2023 jury trial.[1]

{¶ 7}   On February 24, 2022, officers from the Columbus Police Department responded to a report of domestic violence at D.C.'s residence by M.B., a mutual friend of Mr. Perry and D.C.  (*See* Aug. 8, 2023 Tr. Vol. II at 89-95, 142, 323-25; Aug. 10, 2023 Tr. Vol. IV at 709-11.)  M.B. reported observing D.C. injured on the ground, as though she had been hit, during a video call with Mr. Perry.  (*See* Tr. Vol. II at 89-95, 128, 165-66, 322-25.)  M.B. also reported seeing Mr. Perry and D.C.'s nine-month-old daughter, G.P., with them

---

[1] In addition to challenging the sufficiency and weight of the evidence supporting his convictions for felonious assault, abduction, and domestic violence, Mr. Perry also attributes error to specific evidentiary matters in his second and third assignments of error. Additional facts relevant to those evidentiary issues are summarized within our analysis of those assignments of error.

at D.C.'s home during the video call.  (*See* Tr. Vol. II at 90-95, 322; Tr. Vol. IV at 671-72.)  Although Mr. Perry and D.C. are the parents of G.P., Mr. Perry did not reside with them at D.C.'s home because he and D.C. were no longer romantically involved.  (*See* Tr. Vol. II at 315; Tr. Vol. IV at 671-72, 700, 709-14.)

{¶ 8}  Officers responded to D.C.'s South 21st Street residence in Columbus and observed D.C.'s unoccupied vehicle running while parked in front of the home.  (*See* Tr. Vol. II at 90-91, 116; Ex. B.  *See also* Tr. Vol. IV at 680-82, 756-58.)  One of the responding officers, Officer David Schultz, testified that the vehicle was unlocked and he observed a car seat in the back.  (Tr. Vol. II at 91.)  Apparently, Mr. Perry had borrowed D.C.'s vehicle the day before and was returning it when the incident giving rise to this case occurred.  (*See* Tr. Vol. III at 317; Tr. Vol. IV at 673-74, 678-82, 713-15, 756-58.)

{¶ 9}  Officers knocked and announced themselves several times at the front and back doors of D.C.'s home and yelled through the mail slot.  (Tr. Vol. II at 92-94; Tr. Vol. IV at 751-55.)  No one answered.  (Tr. Vol. II at 92-94.)  The officers also attempted to enter the home, but both doors were locked.  (Tr. Vol. II at 92-93.)  After attempting to make contact with the occupants for approximately 30 minutes and having received information about D.C. being injured and the presence of a baby inside of the home, officers became concerned about the wellbeing of D.C. and her child.  (*See* Tr. Vol. II at 90-96.)  Officer Schultz called his shift sergeant, Sergeant Russell Morrow, and obtained permission to force entry into D.C.'s home.  (Tr. Vol. II at 95-96, 143-44.)

{¶ 10}  Officers entered D.C.'s home through an unlocked window.  (Tr. Vol. II at 95-99, 117-20; Ex. B.  *See also* Tr. Vol. II at 143-44.)  Once inside, officers observed Mr. Perry upstairs, ordered him to come downstairs, and detained him while they investigated the scene.  (Tr. Vol. II at 99-100, 166-67.)  Mr. Perry claimed he did not hear the officers knocking because he was in the shower.  (Tr. Vol. II at 99, 135, 137-39; Tr. Vol. IV at 695-98, 744-45, 751-54.)  At trial, Mr. Perry conceded that even after becoming aware of the officers' presence at D.C.'s home and their attempts to make contact with D.C., he did not answer the door.  (*See* Tr. Vol. IV at 752-56, 761-62.  *See also* Tr. Vol. II at 327.)  Ultimately, Mr. Perry was arrested on charges of domestic violence and removed from the scene.  (Tr. Vol. II at 134, 144-45; Tr. Vol. IV at 697-703.)

{¶ 11} Officers made contact with D.C. in the upstairs bedroom while D.C. and her baby were sitting on the bed. (Tr. Vol. II at 99-103, 144-46, 167-68. *See also* Ex. B; Ex. C; Ex. D.) Officer Schultz described D.C.'s face as "swollen up pretty bad" and testified that she was "visibly upset," reluctant to talk, and "in a very somber demeanor, very solemn, very soft spoken." (Tr. Vol. II at 100. *See also* Tr. Vol. II at 102, 327-28.) Sergeant Morrow also made contact with D.C. at the scene, and described observing her crying with a "big welt swelling up on the [left] side of her head." (Tr. Vol. II at 146-47.) Sergeant Morrow also observed D.C. holding her midsection, but she denied being injured in that area. (*See* Tr. Vol. II at 148.)

{¶ 12} Officer Daniel Snyder responded to the scene with a camera to take photographs of D.C.'s injuries, which were shown to the jury and admitted as Exhibits E7 through E9 at trial. (*See* Tr. Vol. II at 168, 171-76, 191.) Officer Snyder observed D.C. "was quiet, clearly upset, and she looked to be in pain." (Tr. Vol. II at 171.) He immediately saw that the left side of D.C.'s eye "was swollen out significantly down to the cheekbone." (Tr. Vol. II at 171-72. *See also* Tr. Vol. II at 174-75, 228-33, 328; Ex. E7; Ex. E8.) Officer Snyder also noticed D.C. holding her midsection, and observed early bruising starting there when D.C. lifted her shirt up so Officer Snyder could photograph that area. (*See* Tr. Vol. II at 172-73, 175-76, 227-28; Ex. E9.)

{¶ 13} D.C. initially told officers that she sustained injuries from falling down the stairs. (Tr. Vol. II at 133; Ex. B; Ex. C.) But, on further questioning, D.C. admitted that Mr. Perry hit her once, causing her to fall to the ground. (Tr. Vol. II at 133, 147-48, 156-58.) Paramedics from the Columbus Fire Department responded to the scene, and, on examination of D.C., observed contusions to her face and the left side of her chest. (*See* Aug. 9, 2023 Tr. Vol. III at 364-72.) At that time, D.C. told medics she had been "assaulted by a male," specifically "[s]he was punched in the face and believes she fell onto either [the] bathroom sink or bathroom toilet." (Tr. Vol. III at 371-72; Ex. F at 2.) Medics also observed that D.C. had "mild difficulty remembering events that occurred." (Tr. Vol. III at 372; Ex. F at 2.)

{¶ 14} Medics transported D.C. to the hospital for emergency medical care. (Tr. Vol. III at 372-74.) At the hospital, D.C. was evaluated by multiple medical professionals including Dr. Sommer Lindsey (Tr. Vol. III at 460) and Allison Craycraft, a registered nurse

with specialized training on working with victims of domestic violence and sexual assault (Tr. Vol. III at 381-86, 392). Dr. Lindsey recounted D.C. telling her she had been "assaulted, punched, and pushed" and was experiencing pain to her right shoulder blade, left chest wall, face, and the scalp area of her head. (Tr. Vol. III at 461-62.) Reading from the report she created at the time, Nurse Craycraft testified D.C. told her that the father of her child " 'hit me with his fists on the side of my head and choked me for about 35 minutes.' " (Tr. Vol. III at 397-98, reading from Ex. G at 2. *See also* Tr. Vol. III at 401-02, 484, 488-89.) Nurse Craycraft read into the record the following observations of D.C. documented in her report: "Patient was emotionally distraught during my assessment. She complained of being hit multiple times in the left side of her face by her baby's dad. Patient had initially denied being strangled [to another person], but she did admit to him strangling her." (Tr. Vol. III at 401-02, 424-25; Ex. G at 7.)

{¶ 15} The medical providers observed signs of strangulation; abrasions (scrapes and scratching) on D.C.'s face, neck, arms, and back; contusions (bruises) to D.C.'s neck, chin, face, scalp, midsection, and left thigh; and a ruptured eardrum. (*See* Tr. Vol. III at 398-405, 421-23, 430-32, 461-75, 479-80, 482-85, 488-92, 503-05; Ex. H.) Imaging showed D.C. had multiple broken ribs on her left side and pneumothorax (a collapsed lung). (Tr. Vol. III at 402-03, 464-69, 493-96; Ex. H.) Nurse Craycraft photographed D.C.'s injuries at the hospital, which were shown to the jury and admitted as Exhibits G1 through G18 at trial. (Tr. Vol. III at 406-16.) Nurse Craycraft and Dr. Lindsey both opined that D.C. had sustained the injuries within hours of presenting to the hospital. (Tr. Vol. III at 417-18, 472-75, 501-03.) Most notably, D.C.'s collapsed lung with fractured ribs prevented her from properly breathing and caused her to experience considerable pain, ultimately resulting in her staying in the hospital for five days. (Tr. Vol. III at 417-18, 420, 433, 467-69, 473-75; Ex. H; Tr. Vol. III at 329-30.)

{¶ 16} D.C. appeared before a grand jury on March 4, 2022 to give sworn testimony about the February 24, 2022 incident. (Tr. Vol. II at 310-11.) Because D.C. refused to appear and testify at Mr. Perry's trial, as discussed more below, the state was permitted to read D.C.'s grand jury testimony into the record at trial, over the objection of the defense, as a substitute for her live testimony. (*See* Tr. Vol. II at 304-37.)

{¶ 17} According to D.C.'s March 4, 2022 grand jury testimony, Mr. Perry arrived at her home around 11:00 a.m. on February 24, 2022. (Tr. Vol. II at 316-18.) While D.C. was in the bathroom, Mr. Perry took D.C.'s phone, read through text messages between D.C. and another man, and became upset. (*See* Tr. Vol. II at 317-19.) He confronted D.C. in the upstairs bathroom by smacking her in the face with an open palm. (*See* Tr. Vol. II at 317-19.) When D.C. stepped back, Mr. Perry repeatedly punched her in the face with a closed fist. (Tr. Vol. II at 319-20.) The force of the third blow caused D.C. to fall down, and while on the ground, Mr. Perry repeatedly hit her "pretty hard" in her midsection and legs while calling her names. (Tr. Vol. II at 320-21.) He continued intermittently hitting her in the bathroom for approximately one and one half hours. (*See* Tr. Vol. II at 321.)

{¶ 18} Eventually, Mr. Perry directed D.C. to go into her bedroom, also located on the upper level of her home. (Tr. Vol. II at 322. *See also* Tr. Vol. II at 319.) D.C. complied, and Mr. Perry sat in the hallway outside of D.C.'s bedroom—preventing her from leaving— while he continued reading conversations between D.C. and another man on D.C.'s phone. (*See* Tr. Vol. II at 322-23, 333-34.) Each time Mr. Perry read something that upset him, he would come into D.C.'s bedroom to confront her by "jumping on" her and spitting in her face, then return to sit in the hall. (*See* Tr. Vol. II at 321-23, 333.) D.C. testified that Mr. Perry video called their mutual friend, M.B., for information about the man D.C. had been messaging, but M.B. denied knowing who the man was. (Tr. Vol. II at 323-25.)

{¶ 19} As mentioned above, M.B. called 911 to express concerns about the safety of D.C. and her baby after the video call with Mr. Perry. (*See* Tr. Vol. II at 336.) D.C. testified that Mr. Perry had control of her phone and forbade her from leaving the bedroom until the police officers arrived and began knocking on the front door. (*See* Tr. Vol. II at 321, 325-27, 333-36.) D.C. explained she did not tell the officers what happened when they spoke with her in her bedroom because she believed Mr. Perry was still in the home. (Tr. Vol. II at 328.) But, at the hospital, she told medical professionals that she had been beaten by Mr. Perry. (Tr. Vol. II at 329.) D.C. testified about her discomfort and difficulty breathing while recovering from her injuries during her five-day hospital stay, and the bruising and pain she experienced one week after the assault. (*See* Tr. Vol. II at 329-33.)

{¶ 20} In his trial testimony, Mr. Perry provided a very different account. Although admitting he had agreed to return to D.C.'s home with her car and drive D.C. to the bank at

11:00 a.m., Mr. Perry claimed he did not arrive at her home until 1:00 p.m. (*See* Tr. Vol. IV at 678-82, 714-18, 756-58.) He categorically denied taking D.C.'s phone and reading her messages. (Tr. Vol. IV at 758.) Instead, Mr. Perry claimed D.C. was already angry when he arrived, expressing concern about his involvement with other women and his whereabouts the night before. (*See* Tr. Vol. IV at 682-91, 716-23, 759, 762-66.)

{¶ 21} Mr. Perry testified that after entering D.C.'s home, he went upstairs to use the restroom. (*See* Tr. Vol. IV at 683.) After using the restroom, Mr. Perry claimed he was playing with G.P. in the upstairs bedroom when D.C. came up behind him, snatched his phone, and tried to run away with it. (*See* Tr. Vol. IV at 682-87, 719-21.) In response, Mr. Perry grabbed D.C. by the side of her sweatshirt, pulled D.C. towards him, and tried to wrestle his phone out of her hands. (Tr. Vol. IV at 686-87, 721-22.) During their struggle, Mr. Perry claimed he inadvertently flung D.C. into the bathtub. (*See* Tr. Vol. IV at 687-91, 721-29.) Mr. Perry testified he then grabbed his phone and left the bathroom. (Tr. Vol. IV at 722-24, 728.) D.C. followed after him and punched him—first, in the face (though he did not sustain any marks or bruises from the encounter). (*See* Tr. Vol. IV at 684-91, 722-25, 728-29. *But see* Tr. Vol. IV at 741-42 (Mr. Perry discussing a June 25, 2022 jailhouse video visit with D.C., wherein he acknowledged smacking D.C. but made no mention of D.C. hitting him).) Mr. Perry testified that he responded by smacking D.C. once, but "pretty hard," with an open palm on the left side of her face. (*See* Tr. Vol. IV at 684-91, 722-30, 742-43.) After speaking with D.C. in her upstairs bedroom, Mr. Perry testified he used the restroom and took a shower. (*See* Tr. Vol. IV at 695-96, 725-26, 742-44, 751-58.)

{¶ 22} Mr. Perry admitted he lied by categorically denying that he hit D.C. when questioned by detectives later that day. (Tr. Vol. IV at 702-03, 759-60.) But he maintained that the altercation with D.C. was brief and explicitly denied scratching, strangling, or hitting D.C. more than once. (*See* Tr. Vol. IV at 688-90.) Mr. Perry posited that D.C. injured herself while they were fighting over his phone, most likely from being flung into the bathtub during their mutual struggle. (*See, e.g.*, Tr. Vol. IV at 687-91, 721-28.) He claimed that D.C.'s March 4, 2022 grand jury testimony about the extent of the assault was false, and speculated that his complicated romantic history with D.C. and other romantic entanglements motivated D.C. to lie under oath. (*See* Tr. Vol. IV at 703, 708-12, 722-23, 762-66.)

## III. ANALYSIS

{¶ 23} We begin our analysis by addressing Mr. Perry's third assignment of error, alleging the trial court erred in permitting the state to offer D.C.'s grand jury testimony and prior statements under Evid.R. 804(B)(6) as a substitute for her live testimony based on the court's pretrial determination that D.C. was unavailable to testify due to Mr. Perry's wrongdoing. We then turn to Mr. Perry's second assignment of error, which claims the trial court erred in admitting testimony from an expert witness on domestic violence. Finally, because his allegations regarding the sufficiency and weight of the evidence supporting his three convictions rely on the same evidence, we address Mr. Perry's first and fourth assignments of error together.

### A. Third Assignment of Error: Admission of D.C.'s Prior Statements Under Evid.R. 804(B)(6)

{¶ 24} In his third assignment of error, Mr. Perry contends the trial court erred in admitting D.C.'s grand jury testimony and permitting the state to present evidence and testimony from responding officers and treating medical providers about D.C.'s statements to them regarding the February 24, 2022 incident. He contends these were testimonial out-of-court statements by D.C., and because she never appeared at trial, he was deprived of his right to confront her under the Sixth Amendment to the United States Constitution.

{¶ 25} The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The United States Supreme Court has held that the admission of a testimonial out-of-court statement of a witness who does not appear at trial violates the Confrontation Clause unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *See Crawford v. Washington*, 541 U.S. 36 (2004), syllabus. However, this right "is not absolute and 'does not necessarily prohibit the admission of hearsay statements against a criminal defendant.' " *State v. Madrigal*, 87 Ohio St.3d 378, 385 (2000), quoting *Idaho v. Wright*, 497 U.S. 805, 813 (1990).

{¶ 26} Evid.R. 801 protects this confrontation right by prohibiting the use of hearsay statements—i.e., statements other than those made by the declarant while testifying at trial offered in evidence to prove the truth of the matter asserted. Hearsay statements are not admissible at trial unless subject to an exception. Evid.R. 801; Evid.R. 802.

{¶ 27} The doctrine of forfeiture by wrongdoing contained in Evid.R. 804(B)(6) is one such exception. *See, e.g., State v. McKelton*, 2016-Ohio-5735, ¶ 96. Under Evid.R. 804(B)(6), the state is permitted to use hearsay statements of an unavailable witness if the state can show, by a preponderance of the evidence, that " '(1) the defendant engaged in wrongdoing that caused the witness to be unavailable and (2) one purpose for the wrongdoing was to make the witness unavailable to testify.' " *State v. Bias*, 2022-Ohio-4643, ¶ 59 (10th Dist.), quoting *McKelton* at ¶ 96, citing *State v. Fry*, 2010-Ohio-1017, ¶ 106, and *State v. Hand*, 2006-Ohio-18, ¶ 84. A preponderance of the evidence means "the existence of the fact sought to be proved is more likely than its nonexistence." *State ex rel. Doner v. Zody*, 2011-Ohio-6117, ¶ 54.

{¶ 28} To satisfy its burden under Evid.R. 804(B)(6), the state is not required to prove that the defendant's sole or even primary purpose was to prevent the witness from testifying. *See, e.g., McKelton* at ¶ 103; *Giles v. California*, 554 U.S. 353, 359-61 (2008). Instead, the state must only show the defendant's wrongdoing causing the witness's unavailability " 'was motivated *in part* by a desire to silence the witness.' " (Emphasis added.) *Bias* at ¶ 59, quoting *Hand* at ¶ 90. Moreover, Evid.R. 804(B)(6) does not require the defendant to commit a criminal act. *State v. Dillion*, 2023-Ohio-777, ¶ 39 (10th Dist.), quoting *State v. Donlow*, 2022-Ohio-1518, ¶ 32 (7th Dist.), quoting *State v. Henderson*, 2018-Ohio-5124, ¶ 21 (7th Dist.). *See also State v. Miller*, 2016-Ohio-4993, ¶ 15 (9th Dist.) (observing that the staff notes to Evid.R. 804(B)(6), as well as Ohio case law, reveal the rule is intended to cover more than criminal acts).

{¶ 29} Here, the state notified the trial court of its intention to present D.C.'s grand jury testimony and other out-of-court statements after D.C. failed to appear for a June 26, 2023 court date and stopped communicating with the prosecution. (*See* June 26, 2023 Hearing Tr. at 5-8.) The trial court attempted to conduct a hearing on that issue on June 26, 2023, but ultimately continued the matter so the quality of the recorded jail calls between Mr. Perry and D.C. could be enhanced. (*See* June 26, 2023 Hearing Tr. at 42-44.) In anticipation of that hearing, on July 1, 2023, the state filed a written motion further articulating its intention to admit D.C.'s prior statements at trial under Evid.R. 804(B)(6), citing Mr. Perry's "persistent efforts to interfere with [D.C.'s] cooperation at trial." (July 1, 2023 Mot. at 3.)

{¶ 30} On July 6, 2023, the trial court conducted an evidentiary hearing on the state's forfeiture-by-wrongdoing motion. At that hearing, the state presented over 600 recorded phone conversations (July 6, 2023 Hearing Ex. C and C1), 3,585 text messages (July 6, 2023 Hearing Ex. D), and 7 video visit recordings (July 6, 2023 Hearing Ex. E) between Mr. Perry and D.C. that took place while Mr. Perry was in jail awaiting trial as evidence of Mr. Perry's attempts to convince D.C. not to testify. (*See also* Aug. 7, 2023 Tr. Vol. I at 4-5.) At all relevant times, Mr. Perry's correspondence with D.C. violated a March 16, 2022 court order prohibiting him from directly or indirectly having any contact with D.C. as a condition of his bond. (*See* Mar. 16, 2022 Additional Bond Conditions. *See also* Mar. 6, 2023 Case Processing Sheet (suspending Mr. Perry's phone privileges until the court could hold a hearing on the matter).)

{¶ 31} In support of its motion to admit D.C.'s out-of-court statements under Evid.R. 804(B)(6),the state represented to the court that "[t]hroughout the duration of this case, [it] had consistent contact with [D.C.], whose cooperation was steady" and "[i]t was not until the State's final trial prep meeting, on January 23, 2023, that [D.C.'s] cooperation began to waiver." (July 1, 2023 Mot. at 3.) The state argued that Mr. Perry's jailhouse conversations with D.C. indicated Mr. Perry was actively encouraging D.C. to recant her testimony, stop cooperating with the prosecution, and not appear for trial.

{¶ 32} In their three audio-recorded phone conversations from January 25, 2023, Mr. Perry told D.C. to sign an affidavit recanting her testimony and get it notarized. (*See* July 6, 2023 Hearing Tr. at 75-76; July 6, 2023 Hearing Ex. C1.) Notably, these conversations took place just five days prior to Mr. Perry's January 30, 2023 court date. (*See* June 26, 2023 Hearing Tr. at 31-32.) And, just as Mr. Perry requested, D.C. obtained and provided the prosecution with a notarized affidavit (dated January 30, 2023) attesting that she "was intoxicated" and "would like to drop all charges against Joshua Perry" because "[n]one of the current happened." (Sic.) (July 6, 2023 Hearing Ex. B. *See also* July 6, 2023 Hearing Tr. at 17-19, 76-77.)

{¶ 33} In the weeks preceding Mr. Perry's June 26, 2023 trial date, Mr. Perry had seven video jail visits with D.C. between June 4, 2023 and June 25, 2023. (*See* July 6, 2023 Hearing Ex. E.) During those recorded visits, Mr. Perry and D.C. discussed D.C.'s attempts at avoiding contact with the prosecution and devised a plan for D.C. to be out of town the

week of Mr. Perry's trial. (*See* July 6, 2023 Hearing Ex. E.) The state asserted that Mr. Perry's efforts at convincing D.C. not to appear for trial had, in fact, been successful because D.C. inexplicably failed to appear for a scheduled in-person meeting with the prosecution on June 23, 2023 and did not appear for trial on June 26, 2023. (*See* June 26, 2023 Hearing Tr. at 5-8, 12-14, 20-25; July 6, 2023 Hearing Tr. at 5-6.)

{¶ 34} The state's investigator, Dana Croom, testified he personally served (or attempted to serve) D.C. with a trial subpoena on multiple occasions and spoke with her numerous times about appearing for Mr. Perry's June 26, 2023 trial prior to that date. (*See* July 6, 2023 Hearing Tr. at 25-39.) Because D.C. indicated she needed transportation to court, the state tasked Investigator Croom with transporting D.C. to and from court for appearances related to the case. (*See* July 6, 2023 Hearing Tr. at 25-26.) Investigator Croom testified that, on June 26, 2023, he went to pick up D.C. from the agreed location (her home) at the agreed time but D.C. was not there. (July 6, 2023 Hearing Tr. at 28-30, 34-36, 74-75.) Investigator Croom knocked on D.C.'s door multiple times and tried calling and texting, but D.C. never responded. (July 6, 2023 Hearing Tr. at 30.) He waited outside D.C.'s residence for almost three hours, but she never appeared and he has not heard from her since. (July 6, 2023 Hearing Tr. at 30.) Given the nature of the voluminous jailhouse correspondence between Mr. Perry and D.C.—particularly in June 2023—D.C.'s failure to appear in court cannot reasonably be attributed to a misunderstanding or scheduling failure. Indeed, the video jail visits plainly showed Mr. Perry and D.C. devising a plan to get D.C. away from her home, at Mr. Perry's request, so she would be absent from trial.

{¶ 35} Following the July 6, 2023 evidentiary hearing on the state's motion, the trial court issued a written decision on August 4, 2023 finding that, in the likely event D.C. did not appear at trial, Mr. Perry purposely and wrongfully caused her unavailability and thus opened the door for D.C.'s prior statements to be admitted at trial. Because D.C. did not appear to testify at trial, the state was permitted to present D.C.'s out-of-court statements against Mr. Perry as evidence. On appeal, Mr. Perry contends this was error.

{¶ 36} Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. *See, e.g.*, *State v. Abdullahi*, 2018-Ohio-5146, ¶ 17 (10th Dist.), citing *State v. Darazim*, 2014-Ohio-5304, ¶ 16 (10th Dist.), citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). However,

where an evidentiary ruling implicates the Confrontation Clause, we review the ruling de novo. *Dillion*, 2023-Ohio-777, at ¶ 40, citing *Bias*, 2022-Ohio-4643, at ¶ 60, citing *McKelton*, 2016-Ohio-5735, at ¶ 97, citing *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010). Here, Mr. Perry contends the admission of D.C.'s grand jury testimony and statements to police, paramedics, and medical professionals violated his constitutional right to confront D.C. under the Sixth Amendment to the United States Constitution.

{¶ 37} It is well-established that the doctrine of forfeiture by wrongdoing creates an equitable exception to a defendant's constitutional right to confront the witnesses against him. *See Dillion* at ¶ 38, citing *Bias* at ¶ 59, citing *McKelton* at ¶ 96, citing *Giles*, 554 U.S. at 366. Indeed, the Supreme Court of Ohio has recognized that "*Crawford* explicitly preserved the principle that an accused has forfeited his confrontation right where the accused's own misconduct is responsible for a witness's unavailability." *Hand*, 2006-Ohio-18, at ¶ 105, citing *Crawford*, 541 U.S. at 62 ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability"), and *Reynolds v. United States*, 98 U.S. 145, 158 (1879) (if a witness is unavailable because of the defendant's own conduct, "he is in no condition to assert that his constitutional rights have been violated"). Simply put, a criminal defendant cannot rely on the Confrontation Clause to preclude the state from presenting evidence from a source **he obstructs**.

{¶ 38} After reviewing the hundreds—if not thousands—of jailhouse communications between Mr. Perry and D.C. (all of which violated the trial court's no-contact order), the trial court determined Mr. Perry actively engaged in wrongdoing with the purpose of persuading D.C. not to testify against him at trial. On review of the record, we likewise find the state adequately demonstrated it was more likely than not that Mr. Perry pressured D.C. to recant her prior testimony about the incident, stop cooperating with the prosecution, and make herself unavailable on his trial date so the state would be forced to either dismiss his charges or proceed without D.C.'s testimony. Mr. Perry's actions accomplished that purpose when D.C. refused to appear for trial. In the absence of any contention by Mr. Perry that the state's evidence was insufficient to support the trial court's finding on appeal, there is no basis for us to conclude the trial court erred in

determining that D.C.'s grand jury testimony and out-of-court statements were admissible under Evid.R. 804(B)(6).

{¶ 39}   Having found Mr. Perry forfeited his confrontation right by engaging in this wrongdoing, the trial court's admission of D.C.'s out-of-court statements did not violate Mr. Perry's Confrontation Clause rights under the Sixth Amendment.  Accordingly, we overrule Mr. Perry's third assignment of error.

### B. Second Assignment of Error: Admission of Expert Witness Testimony

{¶ 40}   In his second assignment of error, Mr. Perry takes issue with the trial court's decision to admit testimony about domestic violence from the state's expert, Sandra Huntzinger.  But because of the limited arguments Mr. Perry presents in support of his claim that it was error to admit this expert testimony under Evid.R. 702, it is difficult to ascertain why he believes that to be true.  On the one hand, he states in his brief that "the defense opposes the State's request to designate Ms. Sandra Huntzinger as an expert witness."  (Appellant's Brief at 23.)  On the other, he argues that "[b]y allowing her testimony, the court risked confusing the jury and diverting attention from the critical facts surrounding the incident," which "could undermine the jury's ability to evaluate the evidence impartially and fairly."  (Appellant's Brief at 23.)  Mr. Perry concludes by asking this court to "recognize this error and consider the prejudicial impact of Ms. Huntzinger's testimony on the integrity of the trial proceedings."  (Appellant's Brief at 23.)

{¶ 41}   In its own brief, the state pointed out the impreciseness of Mr. Perry's argument.  (Appellee's Brief at 28-29.)  Yet, Mr. Perry's appellate counsel did not file a written reply clarifying his argument, as permitted by App.R. 16(C), and waived his appearance at the scheduled oral argument before this court (*see* Mar. 10, 2025 Notice of Waiver of Oral Argument).  Notwithstanding Mr. Perry's ambiguous argument, we will attempt to review the propriety of the trial court's admission of Ms. Huntzinger's expert testimony.

#### 1.  Plain Error Standard of Review Applies

{¶ 42}   On June 9, 2023, the state filed written notice of its intention to present Ms. Huntzinger's expert testimony on domestic violence at Mr. Perry's trial.  (*See* June 9, 2023 Notice.)  Mr. Perry's trial counsel did not file any written opposition to her expert testimony

prior to trial. (*See* Tr. Vol. II at 200.) At trial, the defense generally objected to the admissibility of Ms. Huntzinger's testimony ***before*** she testified in any capacity. (*See* Tr. Vol. II at 197-211.) Specifically, the defense explained:

> Judge, my concern with this witness[] being called as an expert is under, I believe, 702. I'm trying to figure out -- and I would ask the State of Ohio to proffer -- what is this witness going to testify to to a reasonable degree of scientific certainty in terms of being an expert.
>
> And I think I would object in terms of just the witness coming in here talking about, generally speaking, this is a generally rule that applies in each and every case, and we are helping the jury find their way. I don't think there's going to be an issue with the jury finding their way in terms of why a person didn't show up.
>
> I had no problem if she was going to come and talk about why a person would recant, being on her experience. But, why a person wouldn't show up, there's so many reasons. I don't think that that is in any way helpful for a jury to say whether my client did or didn't do anything in this case.

(Sic. passim.) (Tr. Vol. II at 199.)

{¶ 43} The trial prosecutor clarified that "the purpose of offering this witness is to [] aid the jury in the complexities of domestic violence" and indicated Ms. Huntzinger would not be offering any specific opinion as to the facts, circumstances, or parties involved in this case. (*See* Tr. Vol. II at 200-02.) The prosecution noted that the defense intended to use D.C.'s initial denial or downplaying of the incident as a way to impeach the state's theory of the case and D.C.'s grand jury testimony. (*See* Tr. Vol. II at 202-07.) Thus, the state argued—and the trial court agreed—that because "[t]he behavior of a domestic violence victim is absolutely counterintuitive . . . to your average juror," Ms. Huntzinger's expertise would aid the jury in navigating the issues relevant to this case. (*See* Tr. Vol. II at 200-13.)

{¶ 44} After Ms. Huntzinger was questioned about her qualifications and proffered testimony outside the presence of the jury, Mr. Perry's trial counsel did not challenge Ms. Huntzinger's qualifications to testify as an expert on domestic violence. (Tr. Vol. II at 235-37, 252-55, 266-71.) Defense counsel indicated this was because the trial court had stated it would not declare her as an expert in front of the jury. (*See* Tr. Vol. II at 212-13, 235-37.)

Defense counsel also did not object to any specific testimony elicited from Ms. Huntzinger in the presence of the jury. (*See* Tr. Vol. II at 274-303.)

{¶ 45} Because Mr. Perry did not object to Ms. Huntzinger's qualifications or testimony at trial, we review his second assignment of error for plain error. Generally, absent plain error, " 'an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.' " *State v. Campbell*, 69 Ohio St.3d 38, 40 (1994), quoting *State v. Childs*, 14 Ohio St.2d 56 (1968), paragraph three of the syllabus. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Crim.R. 52(B). In reviewing a record for plain error, "[t]he appellate court must examine the error asserted by the defendant-appellant in light of all of the evidence properly admitted at trial and determine whether the [trial court] would have convicted the defendant even if the error had not occurred." *State v. Slagle*, 65 Ohio St.3d 597, 605 (1992). Plain error should be recognized only under exceptional circumstances and to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

### 2. Admission of Domestic Violence Expert Testimony

{¶ 46} A witness may testify as an expert when: (1) the testimony relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; and (3) the testimony is based on reliable scientific, technical, or other specialized information. Evid.R. 702; *State v. Quiller*, 2016-Ohio-8163, ¶ 26 (10th Dist.). A witness has specialized knowledge if she "has information which has been acquired by experience, training or education which would assist the trier of fact in understanding the evidence or a fact in issue." *State v. Nemeth*, 82 Ohio St.3d 202, 211 (1998). *See also State v. Hughes*, 2015-Ohio-151, ¶ 62-63 (10th Dist.). The Supreme Court has held that "professional experience and training in a particular field may be sufficient to qualify one as an expert." *Hughes* at ¶ 63, citing *State v. Mack*, 73 Ohio St.3d 502, 511 (1995). "Additionally, the proffered testimony should assist the trier of fact in understanding the

evidence or in determining a factual issue *and* be relevant to the case." (Emphasis in original.) *State v. Minor*, 47 Ohio App.3d 22, 25 (10th Dist. 1988), citing Evid.R. 402 and 702. As always, relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A).

{¶ 47} The exclusion or admission of relevant evidence generally rests within the trial court's discretion. *State v. Haines*, 2006-Ohio-6711, ¶ 50; *State v. Glenn-Coulverson*, 2017-Ohio-2671, ¶ 24 (10th Dist.). Therefore, a reviewing court will not disturb a trial court's ruling as to the admission or exclusion of expert testimony in the absence of an abuse of discretion that has created material prejudice. *State v. Conway*, 2006-Ohio-2815, ¶ 62; *State v. Stewart*, 2020-Ohio-5344, ¶ 26 (10th Dist.); *State v. Parker*, 2021-Ohio-3422, ¶ 14 (10th Dist.), quoting *State v. Koss*, 2014-Ohio-5042, ¶ 16 (10th Dist.). An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable; however, no court has authority to commit an error of law when exercising its discretion. *State v. Spirnak*, 2020-Ohio-6838, ¶ 16 (10th Dist.).

{¶ 48} Although there are various hurdles and limitations to doing so, the Supreme Court held that the state can, under some circumstances, use expert testimony on battering and its effects to aid the trier of fact in understanding the victim's actions in a prosecution involving domestic violence. *See, e.g.*, *Haines* at ¶ 44-47. " 'Generally, battered woman syndrome testimony is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse.' " *Haines* at ¶ 44, quoting *People v. Christel*, 449 Mich. 578, 580 (1995). "Such seemingly inconsistent actions are relevant to a witness's credibility." *Haines* at ¶ 44. And, because a victim's credibility can be attacked—directly through cross-examination or indirectly through the questioning of other witnesses—" 'the prosecution need not wait until rebuttal to present expert testimony on battered woman syndrome[;] [r]ather, such testimony may be presented as rehabilitative evidence during the state's case-in-chief.' " *Id.*, quoting *State v. Grecinger*, 569 N.W.2d 189, 193 (1997).

{¶ 49} For example, in *Haines*, testimony concerning the defendant's psychological abuse of the victim and controlling behavior was relevant to support testimony by an expert

witness. *Id*. at ¶ 44-45, 50.  On cross-examination of the victim, the defense challenged her credibility by noting that she did not report the abuse, she gave differing explanations regarding some of her injuries, and she remained in the relationship.  *Id*.  The court found that expert testimony about battered woman syndrome could address these supposed anomalies if it is both relevant to providing a context for the victim's conduct and there is an adequate evidentiary foundation establishing the victim is a battered woman.  *See id*. at ¶ 46-47.  " 'In order to be classified as a battered woman, the couple must go through the battering cycle at least twice.  Any woman may find herself in an abusive relationship with a man once.  If it occurs a second time, and she remains in the situation, she is defined as a battered woman.' " *Haines* at ¶ 49, quoting *State v. Koss*, 49 Ohio St.3d 213, 216 (1990).

{¶ 50}  In this case, Ms. Huntzinger testified that she was a court system coordinator at The Center for Family Safety and Healing, a nonprofit organization dedicated to working with victims of domestic violence and operating under Nationwide Children's Hospital. (*See* Tr. Vol. II at 240, 274-75.)  Ms. Huntzinger testified she has a master's degree in social work, had been professionally involved in domestic violence programs for the last 24 years, and had very regular contact with her organization's clients, all of whom are adult victims of domestic violence.  (*See* Tr. Vol. II at 241-48, 274-81.)  Ms. Huntzinger also stated she was generally familiar with the common patterns of behavior in violent relationships, including the cycle of violence and recantation by victims.  For these reasons—and in the absence of any specific challenge to Ms. Huntzinger's qualifications on appeal—any contention that Ms. Huntzinger possessed insufficient specialized knowledge on which to base an expert opinion or was otherwise unqualified to testify as an expert on domestic violence is without merit.

{¶ 51} As to the substance of Ms. Huntzinger's testimony before the jury, Ms. Huntzinger generally explained the cycle of behavior in violent relationships, issues of power and control in those relationships, and reasons why adult victims may be uncooperative in criminal prosecutions of their abusers. (*See* Tr. Vol. II at 282-303.)  Ms. Huntzinger testified she had not done any analysis of this particular case, was not familiar with the relevant facts, and had never interacted with either Mr. Perry or D.C. (*See* Tr. Vol. II at 285-86.)  Notably, in *Haines*, the court held it was improper for the expert's testimony to provide ***diagnostic*** testimony of the victim or otherwise usurp the jury's role as the

finder-of-fact by addressing "the very conclusion that the jury was asked [to] make – whether [the defendant] committed domestic violence against [the victim] – and [was] answer[ing] it" in the affirmative. *See Haines* at ¶ 57-58. *Compare* Dissent at ¶ 89-91. Ideally, in all cases involving the state's introduction of expert witness testimony "to help a jury understand a victim's reaction to abuse in relation to her credibility," *Haines* at ¶ 29, a trial court "should . . . instruct[] the jury on the limits of [the expert's] testimony to eliminate any possible confusion." *McKelton*, 2016-Ohio-5735, at ¶ 167, citing *Haines* at ¶ 57. Although no such instruction was given in this case, Mr. Perry does not challenge the failure to provide the jury with a limiting instruction on appeal. So, that issue is not before us.

{¶ 52} Mr. Perry likewise does not directly challenge the relevance of Ms. Huntzinger's testimony or the adequacy of the foundation for the state's presentation of battered-woman-syndrome expert testimony. However, we find the required foundation for admitting this testimony lacking here. Specifically, the state did not present any evidence or testimony establishing that Mr. Perry and D.C. were in a cycle of abuse. *See, e.g., McKelton* at ¶ 164, citing *Haines* at ¶ 48. Thus, although Mr. Perry did not object to the admission of Ms. Huntzinger's testimony on this basis at trial and does not argue the state failed to predicate Ms. Huntzinger's testimony upon a proper foundation on appeal, we nonetheless find that, in the absence of foundational evidence establishing a cycle of abuse, the admission of Ms. Huntzinger's testimony was error.

{¶ 53} Mr. Perry broadly laments the "prejudicial impact" of Ms. Huntzinger's testimony. (Appellant's Brief at 23.) He contends that, by allowing Ms. Huntzinger's testimony, "the court risked confusing the jury and diverting attention from the critical facts surrounding the incident," which "could undermine the jury's ability to evaluate the evidence impartially and fairly." (Appellant's Brief at 23.) But, ultimately, Mr. Perry's contentions are untethered to concrete support in the record before us. Indeed, like ***all*** evidence presented by the state at a trial involving the prosecution of a criminal defendant, Ms. Huntzinger's testimony could have been damaging or prejudicial to Mr. Perry by increasing the likelihood of his conviction. But, Mr. Perry has not presented any specific argument as to how he was ***unfairly*** prejudiced by this testimony or why he believes Ms.

Huntzinger's testimony on the general characteristics of adult domestic violence victims confused the issues presented in this case or misled the jury. *See* Evid.R. 403(A).

{¶ 54} Even though the state did not establish an adequate foundation for Ms. Huntzinger's testimony, we nonetheless find that, under the plain error standard, Mr. Perry cannot demonstrate the outcome of his trial would have been different had this testimony been excluded. The state presented testimony and evidence about D.C.'s friend calling 911 to express concerns about the safety of D.C. and her baby after the video call with Mr. Perry. (*See, e.g.*, Tr. Vol. II at 336.) Law enforcement responded to the scene, but no one answered the door. (*See, e.g.*, Tr. Vol. II at 92-94; Tr. Vol. IV at 751-55.) After attempting to make contact with the occupants for approximately 30 minutes, the officers made entry into the home through an unlocked window. (Tr. Vol. II at 95-99, 117-20; Ex. B. *See also* Tr. Vol. II at 143-44.) Once inside, the officers encountered Mr. Perry, D.C., and their infant child. (*See* Tr. Vol. II at 99-100, 166-67.) The state's uncontroverted evidence established that D.C. had swelling and bruising to her face at the scene (Tr. Vol. II at 102, 172-73, 328-30), and presented to the hospital with signs of strangulation, a ruptured eardrum, three broken ribs, and a punctured lung (*see* Tr. Vol. II at 328-33; Tr. Vol. III at 398-99, 462-69, 494-95, 503-04; Exs. G1-G18; Ex. H). Photographs of D.C.'s injuries supported law enforcement's observations of D.C., the medical evidence, and D.C.'s grand jury testimony about the incident. As a result of her injuries, D.C. was hospitalized for five days and experienced pain even after her discharge. (*See* Tr. Vol. II at 328-33.)

{¶ 55} Given the considerable evidence of Mr. Perry's guilt as to the felonious assault, abduction, and domestic violence offenses—discussed more below—that was properly admitted at trial, we cannot conclude the trial court ***plainly erred*** in failing to exclude, sua sponte, Ms. Huntzinger's testimony. For these reasons, we overrule Mr. Perry's second assignment of error.

### C. First and Fourth Assignments of Error: Insufficient Evidence and Manifest Weight

{¶ 56} In his first assignment of error, Mr. Perry argues the evidence presented at trial was insufficient to support his convictions for felonious assault, abduction, and domestic violence. He also contends in his fourth assignment of error that his convictions

for these offenses are against the manifest weight of the evidence. For the following reasons, we disagree.

### 1. Applicable Legal Standards

{¶ 57} Whether evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial. *See*, *e.g.*, *State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.); *State v. Frazier*, 2007-Ohio-11, ¶ 7 (10th Dist.); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). We do not weigh the evidence but instead determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 58} In evaluating a sufficiency challenge, we assume the state's witnesses testified truthfully and determine whether that testimony and any other evidence presented at trial satisfied each element of the offense. *See State v. Watkins*, 2016-Ohio-8272, ¶ 31 (10th Dist.), quoting *State v. Hill*, 2008-Ohio-4257, ¶ 41 (10th Dist.). Thus, evidence is sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt. *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

{¶ 59} In contrast, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *See*, *e.g.*, *State v. Richey*, 2018-Ohio-3498, ¶ 50 (10th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11-13, and *Thompkins* at 386-87. "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis." *State v. Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.). "[W]eight of the evidence" concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), quoting *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *Thompkins* at 387.

{¶ 60} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, this court sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). *See also State v. Martin*, 2022-Ohio-4175, ¶ 26.

In making this determination, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See*, *e.g.*, *Sparre v. Ohio Dept. of Transp.*, 2013-Ohio-4153, ¶ 10 (10th Dist.); *Eastley* at ¶ 20; *Thompkins* at 387; *Martin* at ¶ 26.

{¶ 61} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact. *See*, *e.g.*, *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *Morris v. Ohio Dept. of Rehab. & Corr.*, 2021-Ohio-3803, ¶ 64 (10th Dist.), citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 2012-Ohio-1017, ¶ 31 (10th Dist.), citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.* at 80.

{¶ 62} To reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus. *See also State v. Short*, 2024-Ohio-92, ¶ 13 (10th Dist.).

### 2. Analysis

{¶ 63} Mr. Perry's sufficiency and manifest weight challenges are closely related because they pertain to the same evidence supporting his felonious assault, abduction, and domestic violence convictions. Accordingly, we address his first and fourth assignments of error together, while applying the distinct standards of review.

### a. Felonious Assault

{¶ 64} Mr. Perry was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides that "[n]o person shall knowingly . . . [c]ause serious physical harm to another." "Serious physical harm to persons" is defined in R.C. 2901.01(A)(5) to mean any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 65} On appeal, Mr. Perry contends the evidence failed to establish that he "***knowingly*** inflicted physical harm on [D.C.] on the day she presented to the hospital." (Emphasis added.) (Appellant's Brief at 14, citing Tr. Vol. III at 431.) At most, Mr. Perry posits, he should have been convicted of aggravated assault under R.C. 2903.12 as an inferior degree of felonious assault. (Appellant's Brief at 13-18.) The difference between aggravated assault (a fourth-degree felony) and felonious assault (a second-degree felony) is serious provocation involving sudden passion or fit of rage. *See, e.g.*, *State v. Mack*, 82 Ohio St.3d 198, 200-02 (1998).

{¶ 66} Turning to the evidence supporting Mr. Perry's felonious assault conviction, we note he does not challenge the sufficiency or weight of the evidence proving D.C. sustained "serious physical harm," as defined in R.C. 2901.01(A)(5). Indeed, evidence and testimony established D.C. had swelling and bruising to her face at the scene (Tr. Vol. II at 102, 172-73, 328-30) and presented to the hospital with signs of strangulation, a ruptured eardrum, three broken ribs, and a punctured lung (*see* Tr. Vol. II at 328-33; Tr. Vol. III at 398-99, 462-69, 494-95, 503-04; Exs. G1-G18; Ex. H). As a result of her injuries, D.C. was hospitalized for five days and experienced pain even after her discharge. (*See* Tr. Vol. II at 328-33.) Based on the foregoing, we find the evidence sufficiently demonstrates that a temporary, substantial incapacity was inflicted upon D.C. that resulted in prolonged pain and temporary, serious disfigurement. *See* R.C. 2901.01(A)(5). *See also State v. Johns*,

2011-Ohio-6823, ¶ 15 (10th Dist.) (summarizing cases finding various injuries sufficient to support finding of serious physical harm).

{¶ 67} Instead, Mr. Perry's primary contention on appeal is that, in the absence of any eyewitness accounts of the incident, the state failed to prove he "knowingly sought to inflict [serious] physical harm through the act of beating [D.C.]." (Appellant's Brief at 13.) In support, Mr. Perry argues D.C.'s injuries were "inconsistent with his account of events, which included claims that he punched her, causing her to fall into the bathtub and injure her leg." (Appellant's Brief at 14.) At trial, Mr. Perry testified he believed D.C. injured herself by falling down in the bathtub. (*See* Tr. Vol. IV at 687-91, 722-26.) Notwithstanding his purported belief, we find his argument unavailing.

{¶ 68} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). In the absence of a defendant's admission, resolution of whether an individual acts knowingly must be determined from all the surrounding facts and circumstances. *State v. Fielding*, 2014-Ohio-3105, ¶ 51 (10th Dist.); *State v. Henry*, 2018-Ohio-1128, ¶ 51 (10th Dist.). Thus, the test is subjective but usually is decided on objective criteria. *See id.* "Additionally, a defendant acts knowingly, when, although not intending the result, he or she is nevertheless aware that the result will probably occur." *State v. Anderson*, 2010-Ohio-5561, ¶ 13 (10th Dist.), citing *State v. Edwards*, 83 Ohio App.3d 357, 361 (10th Dist. 1992).

{¶ 69} In her sworn grand jury testimony read into the record during trial, D.C. testified that Mr. Perry smacked her with an open palm; punched her in the face with a closed fist multiple times, causing her to fall to the ground; and hit her in her ribs and on her legs "pretty hard" while calling her names. (*See* Tr. Vol. II at 319-21.) She estimated this altercation lasted approximately one and one half hours. (Tr. Vol. II at 321.) At the scene, D.C. told police officers and paramedics that Mr. Perry hit her in the face. (*See, e.g.*, Tr. Vol. II at 133, 147, 158; Tr. Vol. III at 371; Ex. F at 2.) At the hospital, D.C. told medical professionals that Mr. Perry strangled her and struck her multiple times. (*See, e.g.*, Tr. Vol. III at 398, 402, 484-85.) D.C.'s account was corroborated by photographs of her injuries, observations by first responders, and medical evidence showing D.C. sustained swelling

and bruising to her face, contusions and abrasions all over her body, a ruptured eardrum, three broken ribs, and a punctured lung.  (*See* Tr. Vol. III at 398-99, 462-69, 494-95, 503-04; Exs. E7 through E9; Exs. G1-G18; Ex. H.)  D.C. was hospitalized for five days while she recovered from her injuries.  (Tr. Vol. II at 329; Ex. H.)

**{¶ 70}**  Viewing this evidence in the light most favorable to the state, as we must, we find the evidence was sufficient for a rational trier of fact to conclude that Mr. Perry knew that repeatedly punching D.C. in the face, ribs, and legs over a prolonged period would probably cause her serious physical harm.  *See, e.g.*, *State v. Porter,* 2019-Ohio-4868, ¶ 18-19 (10th Dist.).

**{¶ 71}**  For these same reasons, and the reasons set forth below, we likewise cannot say the jury clearly lost its way and created a manifest miscarriage of justice in finding Mr. Perry guilty of felonious assault.  The photographic and medical evidence of D.C.'s injuries was consistent with D.C.'s statements to police and medical providers on February 24, 2022 and her grand jury testimony about the incident.  The state's evidence credibly and consistently established that Mr. Perry assaulted D.C. while he was inside her home.  On appeal, Mr. Perry does not contend the state's evidence was inconsistent in any of these key respects.  True, Mr. Perry presented a different account of events.  However, " 'where a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding . . . as being against the manifest weight of the evidence.' "  *In re L.J.*, 2012-Ohio-1414, ¶ 21 (10th Dist.), quoting *In re Johnson*, 2005-Ohio-4389, ¶ 26 (10th Dist.).

**{¶ 72}**  In this case, the jury, as trier of fact, was in the best position to consider the discrepancies in the testimony regarding the events that took place on February 24, 2022.  The jury was also in the best position to evaluate the credibility of Mr. Perry's live testimony and D.C.'s grand jury testimony as read into the record.  The jury was likewise free to reject the implication by Mr. Perry's trial counsel that D.C. was not a credible witness or otherwise failed to provide truthful testimony for various reasons.  (*See, e.g.*, Tr. Vol. IV at 830-36.)  After reviewing the record and for the reasons set forth above, we cannot say this is one of the rare cases where the trier of fact clearly lost its way in believing D.C.'s testimony when

it found Mr. Perry guilty of felonious assault. Accordingly, we conclude his conviction is not against the manifest weight of the evidence.

**{¶ 73}** Regarding Mr. Perry's contention that he should have been convicted of aggravated assault instead of felonious assault, we note that trial counsel did not request an instruction on aggravated assault at trial. On appeal, Mr. Perry does not raise an ineffective assistance of counsel claim. Nor does he separately explain why he believes the trial court plainly erred in failing to sua sponte instruct the jury on the inferior-degree offense he claims was supported by the evidence. Under App.R. 12(A)(2), an appellate court "may disregard an assignment of error presented for review if the party raising it . . . fails to argue the assignment separately in the brief, as required under App.R. 16(A)." In light of Mr. Perry's failure to comply with the applicable rules, we disregard his contention that, at most, he should have been convicted of an aggravated assault offense.

### b. Abduction

**{¶ 74}** Mr. Perry was convicted of abduction in violation of R.C. 2905.02(A)(2), which provides that "[n]o person, without privilege to do so, shall knowingly . . . [b]y force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear." The term "privilege" is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12). Therefore, to obtain a conviction for abduction, the state had to prove that, without any legal immunity, license or right, Mr. Perry knowingly: (1) used force or made threats directed at D.C.; (2) restrained D.C.'s liberty; and (3) either created a risk that D.C. would suffer physical harm or caused D.C. to experience fear.

**{¶ 75}** "Force" is statutorily defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A). We have construed "restraint of liberty" to mean limiting " 'one's freedom of movement in any fashion for any period of time.' " *State v. Martin*, 2002-Ohio-4769, ¶ 32 (10th Dist.), quoting *State v. Wingfield*, 1996 Ohio App. LEXIS 867, *8 (8th Dist. Mar. 7, 1996). We have also recognized that even "momentary" restraint will qualify as abduction if it causes a risk of physical harm to or fear in the victim. *Id.*, quoting *State v. Swearingen*, 2001 Ohio App. LEXIS 3648 (12th Dist. Aug. 20, 2001), quoting *State v. Saylor*, 1995 Ohio App.

LEXIS 1921 (2d Dist. May 12, 1995). "Risk" is defined as "a significant possibility, as contrasted with a remote possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(7). "Physical harm to persons" refers to "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 76} Thus, to find that Mr. Perry created a risk of physical harm to D.C., the jury did not have to believe Mr. Perry actually harmed D.C. or even that he had tried to harm her; instead, the jury only had to find that Mr. Perry put D.C. "in a position in which she faced 'a significant possibility' of suffering injury, including the possibility that she might injure herself while attempting to escape from a restraint on her liberty." *State v. Coyle*, 2018-Ohio-3194, ¶ 11 (2d Dist.), quoting R.C. 2901.01(A)(7).

{¶ 77} In her grand jury testimony, as read into the record at trial, D.C. testified that Mr. Perry had her phone during the prolonged assault, thus preventing her from calling 911 or anyone else for help. (Tr. Vol. II at 317-25.) Mr. Perry began assaulting D.C. in her upstairs bathroom and eventually directed her to go into her bedroom, also located on the upper level of her home. (Tr. Vol. II at 322. *See also* Tr. Vol. II at 319.) D.C. complied, and Mr. Perry sat in the hallway outside of D.C.'s bedroom—preventing her from leaving—while he continued going through her phone. (*See* Tr. Vol. II at 322-23, 333-34.) D.C. testified that Mr. Perry returned her phone and stopped attacking her only when police arrived and began knocking on the front door. (Tr. Vol. II at 321, 325-27.)

{¶ 78} Viewing this evidence in the light most favorable to the state, as we must, we find the evidence is sufficient for a rational trier of fact to conclude that Mr. Perry used force to restrain D.C.'s freedom of movement when he took her cellphone, repeatedly punched her in the face and other areas of the body, and blocked her from leaving the upstairs bedroom of her home. The evidence and testimony also established Mr. Perry created a risk of physical harm or caused D.C. to experience fear given that D.C. sustained swelling and bruising to her face, a ruptured eardrum, three broken ribs, and a punctured lung as a result of being repeatedly punched by Mr. Perry over a prolonged period. (*See* Tr. Vol. II at 102, 172-73, 328-30; Tr. Vol. III at 398-99, 462-69, 494-95, 503-04; Exs. G1-G18; Ex. H.) Moreover, as the father of D.C.'s child and D.C.'s former romantic partner, Mr. Perry had no privilege to forcefully restrain her in such a manner. Therefore, we find there was

sufficient evidence for the jury to conclude beyond a reasonable doubt that Mr. Perry committed abduction in violation of R.C. 2905.02(A)(2).

{¶ 79} Turning to Mr. Perry's manifest weight challenge, Mr. Perry points to his own testimony asserting he and D.C. were fighting over his phone, D.C. fell down while struggling to grab it, D.C. punched him first, he responded by smacking D.C. once, the altercation concluded, and Mr. Perry got into the shower. (*See* Tr. Vol. IV at 695-96, 744, 751-54, 757-58.) Mr. Perry also contends there was no indication D.C. attempted to leave and that D.C.'s running car outside of the home is somehow proof that D.C.'s liberty was not restrained. (*See* Appellant's Brief at 18-21.) Mr. Perry's manifest weight argument fails because the jury was not required to credit his testimony. The jury was free to believe D.C.'s grand jury testimony that Mr. Perry—who was considerably larger than D.C. (*see* Tr. Vol. II at 101, 147, 334; Tr. Vol. III at 333-34, 368; Tr. Vol. IV at 720-21)—physically assaulted her over a prolonged period, took her cellphone, and prevented her from leaving. *See In re T.W.*, 2024-Ohio-4697, ¶ 19 (10th Dist.); *State v. King*, 2025-Ohio-918, ¶ 31 (10th Dist.). Because D.C.'s testimony was supported by physical evidence of her injuries, we cannot say the jury lost its way or created a manifest miscarriage of justice by crediting D.C.'s account of events (that he blocked her from leaving the bedroom) and discrediting Mr. Perry's testimony (claiming he was in the shower when police arrived). As previously discussed, a conviction is not against the manifest weight of the evidence simply because the jury chose to believe the state's version of events.

{¶ 80} The distinction between sufficiency and weight is not significant as to this offense. Under any test, the evidence was both sufficient and credible to prove, as the jury found, Mr. Perry guilty of abduction.

### c. Domestic Violence

{¶ 81} Mr. Perry was also convicted of domestic violence in violation of R.C. 2919.25(A), which prohibits a person from "knowingly caus[ing] or attempt[ing] to cause physical harm to a family or household member." One definition of "family or household member" is "[t]he natural parent of any child of whom the offender is the other natural

parent or is the putative[2] other natural parent." R.C. 2919.25(F)(1)(b). It is undisputed that, at the time of the incident, Mr. Perry and D.C. shared a child together. And, on appeal, Mr. Perry does not contend D.C. was not a "family or household member" as defined in R.C. 2919.25(F).

**{¶ 82}** As previously discussed, evidence and testimony presented at trial established that Mr. Perry repeatedly struck D.C. over a prolonged period, resulting in swelling and bruising to her face, a ruptured eardrum, three broken ribs, and a punctured lung. (*See* Tr. Vol. II at 102, 172-73, 328-30; Tr. Vol. III at 398-99, 462-69, 494-95, 503-04; Exs. G1-G18; Ex. H.) Viewing this evidence in the light most favorable to the state, we find the evidence was sufficient for a rational trier of fact to conclude that Mr. Perry knew that repeatedly punching D.C. in the face, ribs, and legs over a prolonged period would probably cause physical harm to D.C. *See*, *e.g.*, *State v. Saunders*, 2007-Ohio-1500, ¶ 29 (10th Dist.) (finding evidence establishing the defendant struck his wife multiple times and she suffered pain and bruising was sufficient to support a finding that the defendant knowingly caused, or attempted to cause, physical harm to a family or household member, in violation of R.C. 2919.25(A)).[3]

**{¶ 83}** Regarding his manifest weight challenge, Mr. Perry again relies on his own testimony describing a vastly different series of events than those described by D.C. (*See* Appellant's Brief at 22.) He denied striking D.C. more than once and claimed her injuries could be attributed to her falling in the bathroom. (*See* Tr. Vol. IV at 686-88.) But, as

---

[2] "Putative" is an adjective meaning "commonly accepted or supposed" or "assumed to exist or to have existed." Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/putative (accessed June 5, 2025) [https://perma.cc/ZXC8-J3QW]. *See also* Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/putative (accessed June 5, 2025) [https://perma.cc/2NCK-NJ54] (defining "putative" as "generally thought to be or to exist, even if this may not really be true").

[3] In the alternative, Mr. Perry contends "he should be considered for a lesser offense, such as disorderly conduct." (Appellant's Brief at 21.) Yet, he fails to present any factual or legal argument for why he believes that to be so. We also note that his trial counsel did not request an instruction on disorderly conduct or any other "lesser offense" at trial. (*See* Appellant's Brief at 21.) And on appeal, Mr. Perry does not raise an ineffective assistance of counsel claim. Nor does he separately explain why he believes the trial court plainly erred in failing to sua sponte instruct the jury on disorderly conduct or any other "lesser offense." (*See* Appellant's Brief at 21-22.) Under App.R. 12(A)(2), we "may disregard an assignment of error presented for review if the party raising it . . . fails to argue the assignment separately in the brief, as required under App.R. 16(A)." In light of Mr. Perry's failure to comply with the applicable rules, we decline to address his unargued and unsupported contention.

already explained, a conviction is not against the manifest weight of the evidence simply because the jury chose to believe the state's version of events over the criminal defendant's account. Because D.C.'s account of the incident was supported by evidence and testimony about the nature of her injuries, we cannot say the jury lost its way and created a manifest miscarriage of justice when it found Mr. Perry guilty of domestic violence. This is not the exceptional case in which the evidence weighs heavily against the conviction. Under any test, the evidence was both sufficient and credible to prove Mr. Perry guilty of domestic violence.

### d. Disposition of First and Fourth Assignments of Error

{¶ 84} For all the foregoing reasons, we find there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Mr. Perry committed felonious assault in violation of R.C. 2903.11(A)(1), abduction in violation of R.C. 2905.02(A)(2), and domestic violence in violation of R.C. 2919.25(A). We likewise cannot say the jury lost its way and created a manifest miscarriage of justice by finding Mr. Perry guilty of felonious assault, abduction, and domestic violence. Thus, his convictions were not against the manifest weight of the evidence. Accordingly, we overrule Mr. Perry's first and fourth assignments of error.

## IV. CONCLUSION

{¶ 85} Having overruled Mr. Perry's four assignments of error, we affirm the November 3, 2023 judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT, J., concurs.
JAMISON, P.J., concurs in part and dissents in part.

JAMISON, P.J., concurring in part and dissenting in part.

{¶ 86} Because I would find that the trial court erred in admitting the expert testimony of Sandra Huntzinger and Mr. Perry was prejudiced as a result, I respectfully dissent as to assignment of error number two.

{¶ 87} I take no exception to the majority's decision as to the remaining assignments of error in this case. But I take exception to Ms. Huntzinger's testimony and the prejudicial nature of said testimony prior to the state's presentation of the fact witnesses.

Ms. Huntzinger's testimony failed to provide relevant, credible evidence to substantiate a finding beyond a reasonable doubt of any of the factors that the finders-of-fact needed to make to support a conviction of domestic violence.

{¶ 88} Ms. Huntzinger's testimony before the jury generally explained the cycle of behavior in violent relationships, issues of power and control in those relationships, and reasons why adult victims may be uncooperative in criminal prosecutions of their abusers. The majority decision finds that this testimony was probative and relevant to the issue of why domestic violence victims may downplay or deny abuse and become uncooperative in criminal prosecutions of their abusers. Having reviewed the record, I would find that the admission of Ms. Huntzinger's testimony provided minimal, if any, probative value with a significant danger of unfair prejudice.

{¶ 89} As the majority decision points out, Ms. Huntzinger never interacted with Mr. Perry or D.C., never analyzed this particular case, and was not familiar with the relevant facts. Ms. Huntzinger summarized her observations of victims of domestic violence by stating that, "[w]hat I would say is everyone's reaction is based on their experience with their abusive partner as well as their own experience across a lifetime of whatever their coping skills may be." (Tr. Vol. II at 267.) In other words, a domestic violence victim's reactions depend on their own personal characteristics and experiences. A review of the record reveals no evidence regarding D.C.'s previous experiences with Mr. Perry (or other partners) or her specific "coping skills." Ms. Huntzinger presented no evidence through her testimony in this case regarding D.C.'s personal characteristics or experiences outside of this one incident. Thus, without Ms. Huntzinger knowing anything about D.C.'s relationship with Mr. Perry, or other evidence showing that D.C. was caught in the cycle of domestic violence, there is no relevance of Ms. Huntzinger's testimony.

{¶ 90} In *State v. Stowers*, 81 Ohio St.3d 260 (1998) the Supreme Court of Ohio held that expert testimony about the behavioral characteristics of victims of a specific type of abuse is admissible. However, *Stowers* involved testimony regarding the behavior of an alleged child victim of sexual abuse. *Id.* at 261. Furthermore, the expert's testimony in *Stowers* was based on "conclusions drawn from her observations of the children's behavior." *Id.* at 262. Thus, *Stowers* is distinguishable from this matter. The testimony in this matter, firstly, is not expert testimony, and secondly, is about the behavior of victims

of domestic violence in general. Ms. Huntzinger had no knowledge of the facts of this case, nor had she interacted with either Mr. Perry or D.C.

**{¶ 91}** In fact, the Supreme Court has addressed the admissibility of the kind of testimony at issue in this matter. " 'Expert testimony on the subject of battered woman's syndrome is not relevant unless there is some evidentiary foundation that a party or witness to the case is a battered woman, and that party or witness has behaved in such a manner that the jury would be aided by expert testimony providing an explanation for the behavior.' " *State v. Haines*, 2006-Ohio-6711, ¶ 46, quoting *State v. Borrelli*, 227 Conn. 153, 172, fn. 15 (1993).

**{¶ 92}** Although *Haines* refused to require a set of rigid foundational requirements for this type of evidence, it noted that "[e]vidence generally establishing the cycles of a battering relationship is an appropriate foundation for battered-woman-syndrome expert testimony." *Id.* at ¶ 48. *Haines* went on to cite *State v. Koss*, 49 Ohio St.3d 213 (1989) for the assertion that a couple must go through the cycle of domestic violence twice before a party could be classified as a "battered woman." *Haines* at ¶ 49.

**{¶ 93}** A review of the record in this matter reveals that a proper foundation for Ms. Huntzinger's testimony was not developed to demonstrate its relevance. There was no evidence that D.C. was stuck in a cycle of violence. Furthermore, Ms. Huntzinger had no knowledge of this case, meaning her opinions could not be connected to any of D.C.'s actions, or inactions, in this matter.

**{¶ 94}** In addition to its lack of relevance, I believe that Ms. Huntzinger's testimony was extremely prejudicial. Indeed, the Supreme Court has recognized the prejudicial impact of this type of testimony, noting that it tends to label the victim as a battered woman and "usurps the jury's role as finder-of-fact." *Haines* at ¶ 55. Although it is true that unlike the expert witness in *Haines*, Ms. Huntzinger did not specifically diagnose D.C. as a "battered woman" or offer specific conclusions regarding D.C.'s behavior, Ms. Huntzinger testified to the jury that her program "is dedicated to working with victims of domestic violence." (Tr. Vol. II at 275.) She went on to assert that "100 percent" of her clients are victims of domestic violence. *Id.* This testimony was immediately followed in the state's case-in-chief by the recitation of D.C.'s grand jury testimony without cross-examination.

Thus, the jury was given no other logical conclusion than D.C. was in fact a victim of domestic violence.

{¶ 95} The prejudicial impact of the admission of Ms. Huntzinger's testimony was compounded by the fact that the trial court did not provide a limiting instruction as required by *Haines*. *State v. Long*, 2011-Ohio-1050, ¶ 26 (9th Dist.), citing *Haines* at ¶ 57. Furthermore, although it may be argued that the trial court's refusal to label Ms. Huntzinger as an expert witness in front of the jury somehow reduced her testimony's prejudicial impact, the jury was still presented with extensive, uncontroverted testimony of her experience working with *victims* of domestic violence for more than 20 years.

{¶ 96} I would also like to point out that the holding in *Haines* is very specific. The court held, "that when a victim's credibility is challenged upon cross-examination during the state's case-in-chief, the state may introduce expert testimony regarding battered woman syndrome to aid the trier-of-fact in determining the victim's state of mind, e.g., to explain why she returned to the defendant despite aggressions toward her." *Haines* at ¶ 65. That is not what happened here. The state preemptively bolstered the D.C.'s out-of-court statements before those statements were even admitted into evidence. Although the cross-examinations of the responding officers poke at D.C.'s credibility, it still is a different situation than the one allowed in *Haines*. It is also worth noting that the dissent in *Haines* opined that the majority's decision was an unwarranted extension of *Koss* which only permitted expert testimony on battered-woman-syndrome to establish self-defense. Thus, it could be argued that permitting the state to introduce battered-woman-syndrome testimony in the manner it did in this case, is yet another unwarranted extension of the very specific holding in *Haines*.

{¶ 97} Because I would conclude that the prejudicial impact of Ms. Huntzinger's testimony significantly exceeded it's minimal, if any, probative value, I would sustain Mr. Perry's second assignment of error.

{¶ 98} For these reasons, I respectfully concur in part and dissent in part.

_____